Sean R. Kelly (skelly@saiber.com)
Jakob B. Halpern (jhalpern@saiber.com)
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
(973) 622-8394

*Of Counsel:*
John M. Williamson (john.williamson@finnegan.com)
Jennifer H. Roscetti (jennifer.roscetti@finnegan.com)
Charles T. Collins-Chase (Charles.collins-chase@finnegan.com)
Paul W. Townsend (paul.townsend@finnegan.com)
Jordan M. Gringauz (Jordan.gringauz@finnegan.com)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4431
(202) 408-4000

Candace C. Walther (candace.walther@finnegan.com)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363-6209
(404) 653-6400
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCKET PHARMACEUTICALS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. |
| LEXEO THERAPEUTICS, INC., | ) |
| KENNETH LAW, and | ) **JURY TRIAL DEMANDED** |
| SONIA GUTIERREZ, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Rocket Pharmaceuticals, Inc. ("Rocket Pharma" or "Plaintiff") alleges as follows against Defendants Lexeo Therapeutics, Inc. ("Lexeo"), Kenneth Law ("Mr. Law"), and Sonia Gutierrez ("Ms. Gutierrez") (collectively "Defendants").

## INTRODUCTION

1.      This is a civil action against Lexeo, Mr. Law, and Ms. Gutierrez for trade secret misappropriation arising under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)-(c), trade secret misappropriation under state law, breach of contract, tortious interference with contractual relations, and unfair competition.

2.      Rocket Pharma is a leading late-stage biotechnology company focused on bringing hope and relief to patients suffering from devastating, rare pediatric diseases by meeting a substantial unmet need for effective therapies. Each therapy Rocket Pharma develops is intended to be transformative, enabling not only reversal of the disorder at molecular and cellular levels, but also sustained relief from debilitating and potentially life-threatening symptoms.

3.      To achieve those objectives, Rocket Pharma invested many years and millions of dollars in the innovation necessary to develop its potentially curative, first-in-class cell and gene therapies that directly target specific genetic mutations in patients' affected cells.

4.      Rocket Pharma expended vast resources over the last eight years developing a pipeline of cell and gene therapies, typically employing either the adeno-associated virus ("AAV") or the lentiviral vector ("LVV") platforms. Rocket Pharma tailors its platforms and technologies to optimize results when targeting particular diseases.

5.      Rocket Pharma's path to developing the robust, but immensely complex, processes and workflows needed to make its therapies begins with research relating to gene chemistry

(including gene selection, vector and plasmid design, and engineering). Next, Rocket Pharma establishes reliable manufacturing controls (including process development, quality assurance, and regulatory compliance). As part of that work, Rocket Pharma developed purification and characterization methods specifically for its innovative cell and gene therapies. After that has been done, Rocket Pharma subjects each of its cell and gene therapies to rigorous testing, ranging from preclinical studies to Phase III clinical trials in actual patients.

6. Developing successful therapies requires preclinical and clinical trials that have been meticulously designed such that regulatory authorities around the world will deem Rocket Pharma's therapies safe and effective in treating their targeted genetic diseases. To maximize the efficacy of its cell and gene therapies, Rocket Pharma also developed specific pre-drug delivery operating procedures. And because the devastating pediatric diseases treated by Rocket Pharma's cell and gene therapies are *rare*, it has been necessary to devote significant resources to patient identification and recruitment to ensure sufficient numbers to support Rocket Pharma's regulatory submissions.

7. In view of the enormous effort and resources Rocket Pharma devotes to developing its AAV gene therapy and LVV cell therapy programs, Rocket Pharma carefully guards its confidential and proprietary information. Nearly every step of the process detailed above is steeped in trade secrets. Rocket Pharma's confidential and proprietary business information includes trade secrets such as pricing strategies, cost structures, distribution networks, and supplier agreements each of which is vital for managing the costs associated with Rocket Pharma's gene therapy development and production. On the clinical side, Rocket Pharma's trade secrets include information regarding its engagement with clinical trial experts and regulatory authorities in designing its clinical trials to support high-quality data demonstrating the safety and efficacy of its cell therapy and gene therapy programs. Furthermore, Rocket Pharma has developed a clinical trial

infrastructure that allows for the safe handling of the therapeutic from the manufacturing plant to the patient. This infrastructure is critically dependent on delicate procedures and business agreements with third parties. The procedures and partnerships in this area are vital to ensure the success of Rocket Pharma's clinical trial programs. Rocket Pharma protects all such information as confidential and proprietary.

8.      The first AAV-based gene therapy developed by Rocket Pharma is for Danon disease, a rare neuromuscular and cardiovascular disease that is characterized by the thickening of the heart muscle. This condition can affect people of all ages, including children and adults, by making it harder for the heart to pump blood effectively.

9.      Building on its early successes with its AAV Danon program, Rocket Pharma extended its work in the cardiovascular field, including its development of an AAV treatment for PKP2-arrhythmogenic cardiomyopathy ("ACM"). ACM is characterized by (i) frequent and life-threatening abnormal heart rhythms that originate in the lower chambers of the heart, known as the ventricles; and (ii) structural ventricular myopathy that involves abnormalities in the structure and function of the ventricles responsible for pumping blood to the body. Rocket Pharma invested tens of millions of dollars in research and development for its PKP2 program since mid-2020.

10.     In addition to AAV-based gene therapy programs, Rocket Pharma also invested in developing a robust LVV-based cell therapy pipeline. To date, Rocket Pharma has three late-stage LVV-based cell therapy programs in clinical trials to treat hematology-related diseases such as Fanconi Anemia, a rare genetic disorder affecting DNA repair characterized by bone marrow failure (very low blood cell counts), cancers of the blood, or other cancers.

11.     Lexeo now seeks to compete directly with Rocket Pharma on PKP2, and likely other Rocket Pharma cell and gene therapies as well. On information and belief, Lexeo sought to emulate the successful strategies employed by Rocket Pharma, including using some of the very

same gene therapy platforms and targets. Lexeo knowingly hired away key Rocket Pharma employees who helped develop Rocket Pharma's proprietary trade secrets while they were employed at Rocket Pharma, and who unlawfully took Rocket Pharma's proprietary trade secrets with them to Lexeo, including using Rocket Pharma's information to aid Lexeo's development and implementation of AAV therapies in the cardiac field.

12.    On information and belief, Lexeo hired key Rocket Pharma scientists and exploited Rocket Pharma's confidential information to meet the unrealistic timelines it touted to investors in its quest to catch up to Rocket Pharma's programs, including its AAV cardiovascular gene therapies. In January 2021, for example, Lexeo boldly claimed that it would enroll patients in a Phase I clinical trial by *year-end* for an AAV gene therapy treatment targeting cardiac pathology, one of Rocket Pharma's long-named targets and platforms.[1] On information and belief, Lexeo was not equipped to meet that deadline. Despite frantically buying up preclinical data from others following its January 2021 announcement, in October 2021, Lexeo publicly acknowledged that it lacked the manufacturing capabilities for its clinical staged programs.[2] Thus, a mere two months before Lexeo told investors it was to begin enrolling patients, Lexeo finalized a manufacturer agreement so it could rely on its new partner to "provide good manufacturing practice (GMP) production, analytical development, process optimization, and chemistry, manufacturing and controls (CMC) for LEXEO's clinical-stage programs."[3, 4]

---

[1] Press Release, Lexeo Therapeutics, LEXEO Therapeutics Launches with $85 Million Series A Financing to Develop Gene Therapies for Rare and Non-Rare Monogenic Diseases (Jan. 7, 2021), https://www.lexeotx.com/wp-content/uploads/2021/01/LEXEO-Launch-Press-Release.pdf.

[2] Press Release, Lexeo Therapeutics, LEXEO Therapeutics and FUJIFILM Diosynth Biotechnologies Announce Collaboration to Support Development and Manufacturing of Gene Therapies for Genetic Diseases (Oct. 13, 2021), https://www.lexeotx.com/wp-content/uploads/2021/10/LEXEO-TX-Press-Release_CDMO-Partnership_FINAL.pdf ("LEXEO Therapeutics and FUJIFILM Diosynth Biotechnologies Announce Collaboration").

[3] *Id.*

[4] *See, e.g.*, Press Release, Lexeo Therapeutics, LEXEO Therapeutics Announces License Agreement and Consolidation of Comprehensive Pre-clinical Data Package to Support Cardiac

13.     At the same time, Lexeo sought to hire Rocket Pharma employees with experience and exposure to confidential Rocket Pharma information that could jumpstart Lexeo's delayed program. Lexeo interviewed and sent formal offer letters to Mr. Law, who was an Associate Director of Chemistry Manufacturing, Controls (CMC) and Analytical Development at Rocket Pharma, and Ms. Gutierrez, who was a Senior Scientist at Rocket Pharma.

14.     Rocket Pharma did not know, nor could it have reasonably discovered, that Lexeo's new hires, and by extension, Lexeo planned to steal Rocket Pharma's confidential and proprietary trade secrets related to the development of an AAV gene therapy and other therapies. Just before leaving Rocket Pharma, on September 19, 2021, Mr. Law downloaded his Lexeo offer letter from his Gmail account accessed from his Rocket Pharma-issued computer. Five days later, on September 24, 2021, Mr. Law created a folder on his Rocket Pharma computer to which he uploaded over 122,987 work-related emails and documents. The following day, Mr. Law, for the benefit of his new employer Lexeo, transferred these work-related emails and documents to his personal computer.

15.     After his initial download, and just days before his departure, Mr. Law deceptively set into motion a plan to conceal additional unlawful downloads. On October 10, 2021, Mr. Law used an unauthorized application, "AppCleaner," on his Rocket Pharma-issued computer. AppCleaner is used to erase evidence of deleted applications. Mr. Law synced this application to his OneDrive to mask further data transfers from his Rocket Pharma computer. On his final day of work, October 15, 2021, Mr. Law inserted two USB drives that had over a terabyte's worth of storage into his Rocket Pharma computer. On information and belief, Mr. Law downloaded

---

Friedreich's Ataxia Gene Therapy Program (LX2006) (Mar. 1, 2021), https://www.lexeotx.com/wp-content/uploads/2021/03/LEXEO-TX-Announces-Licensing-Agreement.pdf ("Adverum Biotechnologies Press Release").

additional Rocket Pharma files onto the drives without detection due to AppCleaner.

16.     That same day, Mr. Law covertly took unauthorized photos of Rocket Pharma laboratories using his work phone. His photos captured proprietary lab protocols from a fellow employee's lab notebook, cell culture techniques, and cell data related to AAV and LVV cell and gene therapy development.

17.     Just three weeks before leaving Rocket Pharma, Ms. Gutierrez also transmitted confidential and proprietary Rocket Pharma trade secret information to her personal email account in violation of her obligations to Rocket Pharma. Ms. Gutierrez forwarded an e-mail to her personal Gmail account from her former supervisor, who held the job title of Associate Vice President, Chemistry Manufacturing and Control (CMC) Lentivirus & AAV, that included a link he described as containing "[e]very file I have ever generated at Rocket." This link held substantial amounts of Rocket Pharma confidential and proprietary manufacturing documents.

18.     With Lexeo's new hires of both Mr. Law and Ms. Gutierrez, Lexeo obtained a synergistic advantage, as both Mr. Law and Ms. Gutierrez not only worked together at Rocket Pharma but also compounded their knowledge of Rocket Pharma's confidential, proprietary, and trade secret information. Lexeo, including through its newly hired employees, concealed its unlawful acquisition and use of Rocket Pharma's confidential and proprietary trade secrets.

19.     To cover their tracks and dissuade Rocket Pharma from scrutinizing their departure, Mr. Law and Ms. Gutierrez hid their new employment at Lexeo during their individual exit interviews. In each interview, Rocket Pharma informed Mr. Law and Ms. Gutierrez of their obligation, pursuant to an employment agreement, to disclose the identity of their new employer. Both Mr. Law and Ms. Gutierrez refused to reveal that they were leaving to work for Lexeo. Mr. Law further covered his tracks by deleting his Lexeo offer letter from his Rocket Pharma-issued computer shortly after he downloaded it.

20.     Lexeo continued the cover-up. Rocket Pharma first became aware that Mr. Law had begun working at Lexeo in December 2021, two months after he left. Because Mr. Law had had significant access to Rocket Pharma's confidential information, Rocket Pharma sent notice letters to both Mr. Law and Lexeo addressing the potential for misuse of Rocket Pharma's confidential, proprietary, and trade secret information.

21.     Rocket Pharma explained to Mr. Law that he should not disclose or use any of the substantial confidential, proprietary, and trade secret information about Rocket Pharma that he had learned in his new role at Lexeo. The letter further reminded Mr. Law of his obligations under an agreement he signed on October 13, 2016 (the "Law Agreement"), imposing non-disclosure obligations, restricted use obligations, and non-solicitation obligations, and informed Mr. Law that any violations of the agreement would not be tolerated.

22.     At the same time, Rocket Pharma sent a letter to Lexeo, containing similar notices, informing Lexeo of Mr. Law's obligations under the Law Agreement, and warning Lexeo of Mr. Law's knowledge of Rocket Pharma's confidential, proprietary, and trade secret information. Rocket Pharma's letter informed Lexeo of the letter sent to Mr. Law and of Rocket Pharma's expectations that Lexeo would refrain from putting Mr. Law in a position where he would use and/or disclose Rocket Pharma's confidential, proprietary, and trade secret information.

23.     Lexeo responded, stating that Mr. Law would not be working on any program similar to his work at Rocket Pharma and, as such, there was no risk that Mr. Law would be using or disclosing Rocket Pharma's confidential, proprietary, and trade secret information. Rocket Pharma relied on Lexeo's representations.

24.     Rocket Pharma recently came to learn that Lexeo did the exact opposite. Lexeo placed Mr. Law and Ms. Gutierrez in analogous roles to aid Lexeo in manufacturing AAV gene therapies. In May of this year, Rocket Pharma scientists observed a Lexeo published poster at a

conference directed to AAV research in the cardiac field. The Lexeo poster named Mr. Law and Ms. Gutierrez as authors, each possessing roles at Lexeo that would exploit their knowledge of Rocket Pharma's confidential, proprietary, and trade secret information despite Lexeo's express representation to the contrary.[5]

25.     In their prior roles as Rocket Pharma employees, both Mr. Law and Ms. Gutierrez had access to Rocket Pharma's confidential, proprietary, and trade secret information related to studying AAV serotypes and developing AAV products that have enhanced tropism, favorable vector biodistribution, and high transgene expression for heart tissue, including AAV9 vectors. Lexeo's poster exhibited some of the work Mr. Law and Ms. Gutierrez completed for Lexeo, in studying AAV serotypes and products which have enhanced tropism, favorable vector biodistribution, and high transgene expression for heart tissue, including AAV9 and AAVrh10 vectors.

26.     Further, Lexeo not only hired Rocket Pharma's employee, Mr. Law, but attempted to recruit, without success, one or more additional Rocket Pharma employees with intimate knowledge of Rocket Pharma's AAV trade secrets through Mr. Law.

27.     Lexeo, on information and belief, continues to make use of unlawfully obtained Rocket Pharma trade secrets. Just two months ago, Lexeo announced FDA clearance of an AAV-based gene therapy treatment designed to deliver a functional PKP2 gene to cardiac muscle cells to treat arrhythmogenic cardiomyopathy ("ACM"), the same target as Rocket Pharma's PKP2 therapy.[6] Although Mr. Law was not a direct member of Rocket Pharma's PKP2 team, he had access

---

[5] Poster Presentation, Lexeo Therapeutics, Vector Biodistribution and Transgene Expression in the Heart Following Gene Transfer of AAV.rh10 vs. AAV9 Capsids, American Society of Gene & Cell Therapy (May 16-20, 2023) ("Lexeo Poster Presentation").
[6] Press Release, Lexeo Therapeutics, LEXEO Therapeutics Announces FDA Clearance of IND for LX2020, an AAV-based Gene Therapy Candidate for PKP2 Arrhythmogenic Cardiomyopathy (Aug. 1, 2023), https://www.lexeotx.com/wp-content/uploads/2023/07/LEXEO-PKP2-IND-

to and knowledge of Rocket Pharma's AAV manufacturing processes, analytical assay development for each of Rocket Pharma's heart programs, Investigational New Drug Applications ("INDs"), health authority correspondences, and clinical trial information.

28.     On information and belief, this information allowed Lexeo to close the gap with Rocket Pharma and receive IND clearance from the FDA for its PKP2 program just weeks after Rocket Pharma secured the same.

29.     Defendants' conduct threatens uncontrolled and irreparable access, use, and dissemination of Rocket Pharma's trade secrets. The Defendants' willful and malicious misappropriation of Rocket Pharma's trade secrets requires Rocket Pharma to file this lawsuit seeking injunctive relief and damages for the harm that has been caused by Defendants' illegal conduct. Unless enjoined, Rocket Pharma will be deprived of the advantage lawfully earned through the hard work, significant strides of its researchers, years of development in an uncertain field, significant financial investments and risks, and regulatory, scientific, manufacturing, and clinical successes, all while Defendants took their illegal developmental shortcut and economic windfall at Rocket Pharma's expense.

---

Clearance-PR_vFinal.pdf ("FDA Clearance of LX2020").

## THE PARTIES

30.     Plaintiff Rocket Pharmaceuticals, Inc., is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 9 Cedarbrook Drive, Cranbury, NJ 08512. Rocket Pharma is engaged in the development of cell and gene therapies for rare genetic diseases.

31.     Defendant Lexeo Therapeutics, Inc., is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 345 Park Avenue South, 6th floor, New York, NY 10010.

32.     On information and belief, Defendant Kenneth Law is a natural person residing at 11-17 47th Rd., Apt. 2R, Long Island City, NY 11101.

33.     On information and belief, Defendant Sonia Gutierrez is a natural person residing at 301 W 57th Street, Apt. 25F, New York, NY 10019.

## JURISDICTION AND VENUE

34.     This action arises under the DTSA, 18 U.S.C. § 1836 et seq.

35.     This Court has subject matter jurisdiction over the federal claims asserted in this Complaint under 28 U.S.C. § 1331 because this action arises under the DTSA.

36.     This Court also has supplemental jurisdiction over the claims in this Complaint that arise under state common law pursuant to 28 U.S.C. § 1367(a).

37.     This Court has general personal jurisdiction over Lexeo. Lexeo's corporate headquarters and principal place of business is located within the state at 345 Park Avenue South, 6th floor, New York, NY 10010.

38.     This Court has general personal jurisdiction over Mr. Law. Mr. Law is a natural person residing in the state at 11-17 47th Rd., Apt. 2R, Long Island City, NY 11101.

39.     Mr. Law consented to personal jurisdiction in New York when he signed the Law Agreement. Specifically, ¶ 13.1 of the signed Law Agreement states: "I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the State of New York."

40.     This Court has general personal jurisdiction over Ms. Gutierrez. Ms. Gutierrez is a natural person residing in the state at 301 W 57th Street, Apt. 25F, New York, NY 10019.

41.     Ms. Gutierrez consented to personal jurisdiction in New York when she signed the Gutierrez Agreement with Rocket Pharma containing, inter alia, non-disclosure obligations, non-use obligations, and a consent to jurisdiction clause ("Gutierrez Agreement"). Specifically, ¶ 15.1 of the signed Gutierrez Agreement states: "I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the State of New York."

42.     Venue is proper in this federal District pursuant to 28 U.S.C. § 1391 because all the defendants are residents of the state.

## DETAILED FACTUAL ALLEGATIONS

**A.    Rocket Pharma Invested Years of Research and Development in Cell and Gene Therapies**

43.    Rocket Pharma is a leading late-stage biotechnology company focused on developing a pipeline of first-in-class cell and gene therapies that employ either AAV or LVV platforms. Rocket Pharma's development of its cell and gene therapies has involved an extensive process. Rocket Pharma invested significant resources at each step, beginning with the investigation of the genetic target, followed by conducting its own preclinical animal studies, developing clinical trial protocols, conducting clinical trials, developing regulatory strategies for securing FDA approval as quickly as possible, and establishing its own manufacturing facility.

44.    AAVs are viral vectors used for gene delivery to treat genetic diseases. For example, if a patient is suffering from a genetic disease resulting from a protein deficiency in heart cells, an AAV can be packaged with a gene that will, when appropriately delivered to cells of the heart, result in the production of the deficient or missing protein. Unlike a normal virus, modified AAV viral constructs can be used as potential therapeutics since the viral genes needed for replication have been removed. This approach allows scientists to utilize AAV vectors, when packaged with potential therapeutic DNA, to target diseased cells, while greatly minimizing potential harm to the patient. The serotype, or surface, of an AAV can be modified in a way that encourages binding to certain cell types. Using the same example as above, the specific selection of an AAV or modifying an AAV vector's serotype can be used to target the patient's heart cells. This allows scientists to deliver a smaller and more efficient amount of the treatment while minimizing the risk of adverse effects to the patient due to binding and entry into non-target cells. Rocket Pharma invested years of research and development to select AAV serotypes and to design efficient expression cassettes (the genetic cargo within the AAV capsid) to maximize their efficacy when

used to treat rare cardiac diseases.

        **i.**    **Rocket Pharma Developed Complex and Efficient AAV and LVV Manufacturing Processes**

45.     Rocket Pharma directs a substantial portion of its research and development to the AAV and LVV manufacturing processes. As a result of these efforts, Rocket Pharma developed proprietary and confidential manufacturing methods. AAV and LVV manufacturing are complex, time-consuming, and expensive processes that include multiple steps. Rocket Pharma's manufacturing processes save millions on manufacturing costs and ensure control over manufacturing timelines and the quality of the final product. The shorter production times and cost savings also allow Rocket Pharma to invest key resources in investigating and developing potential AAV gene and LVV cell therapies for new targets faster than a competitor can, increasing the chances of developing successful therapeutics.

46.     Rocket Pharma made a substantial investment in developing a 103,720-square-foot in-house manufacturing facility, which is dedicated to both AAV and LVV manufacturing. Rocket Pharma also developed confidential protocols and processes necessary to achieve cGMP manufacturing readiness for its AAV programs, which it achieved in 2022. Rocket Pharma's AAV manufacturing processes may be divided into three parts: (1) upstream manufacturing, (2) downstream manufacturing, and (3) formulation. Each part is complex with multiple steps that require substantial optimization and synchronization.

47.     The upstream AAV manufacturing process begins after extensive research and development identifies the appropriate AAV capsid (serotype) and after designing the transgene expression cassette, where promotor and regulatory elements are selected based on the target cell population and the target level of a therapeutic protein. AAV viral vectors are ultimately produced by cells that are grown in highly controlled environments to a desired concentration using a complex

14

process. After the target concentration of cells is reached, they are placed into a bioreactor along with the appropriate plasmids, which enable the cells to produce the desired AAV treatment. Each step requires highly controlled environments to ensure maximum AAV production.

48.      The downstream process isolates and purifies the AAVs produced by the cells. It begins once the cells are removed from the bioreactor and lysed. Cell lysis breaks down the cell membranes, which helps release the AAVs from within cells. After the cells are lysed, the resulting mixture undergoes a series of steps to concentrate and purify the mixture into isolated AAVs, such as chromatography and tangential flow filtration.

49.      Once isolated, the AAV viral vector preparation undergoes a formulation step to ensure appropriate composition and concentration, after which a series of quality tests are performed during which confirmation of ability to express the appropriate therapeutic protein is evaluated.

50.      Prior to establishing its manufacturing processes, Rocket Pharma painstakingly developed strategic partnerships with third-party manufacturers to produce AAV therapies for Rocket Pharma as well as help it develop its own in-house protocols for AAV manufacturing. Mr. Law stole thousands of pages of documents marked "CONFIDENTIAL" that relate to these partnerships and the in-house development of AAV manufacturing processes.

51.      Rocket Pharma also developed strategic partnerships with third-party manufacturers to produce LVV therapies. Rocket Pharma developed its own proprietary methods and procedures for developing LVV vectors to be used by the third-party manufacturers. Mr. Law stole confidential documents relating to these partnerships and detailing confidential and proprietary trade secret information, including Rocket Pharma's GMP-source transfer procedure, packaging plasmids and cell banks, certifications for the plasmids, and detailed protocols for the production, analysis, shipping, and storage of LVV vectors.

### ii.    Rocket Pharma's Clinical Trial Programs

52.     Rocket Pharma dedicated substantial resources to multiple clinical trial programs testing the efficacy of its AAV gene and LVV cell therapies. To date, Rocket Pharma has five cell and gene therapies in clinical trials. Running a successful clinical trial requires partnerships with multiple institutions all over the world. Part of the success of Rocket Pharma's clinical trials depends on the operational know-how Rocket Pharma has gained through years of trial and error orchestrating these clinical trials. In addition, part of the success of Rocket Pharma's programs depends on the know-how and expertise Rocket Pharma has generated in managing regulatory review and approval.

53.     In November 2018, Rocket Pharma announced its pioneer AAV program for Danon disease, a rare and devastating cardiovascular disease. Rocket Pharma announced findings from preclinical studies conducted in animals establishing proof-of-concept for the RP-A501 program, demonstrating improved survival and correction of the disease phenotype while maintaining a clean safety and tolerability profile. Throughout 2019, Rocket Pharma continued to perform additional preclinical studies, including IND-enabling toxicology studies in mice and non-human primates, to demonstrate the safety and efficacy of the therapy.

54.     After completing preclinical studies for its Danon disease therapy, Rocket Pharma next set out to start its clinical trial program. In June 2019, Rocket Pharma announced that patient dosing had begun in the open-label, Phase 1 clinical trial for Danon disease, after over two years of work on preclinical studies. In December 2022, after more than two years of clinical studies and close to six years after beginning the program, Rocket Pharma completed the end-of-Phase 1 meeting with the FDA. Rocket Pharma also began discussions with the FDA about trial design using drug products manufactured at Rocket Pharma's in-house cGMP AAV facility and is now approaching final alignment with the FDA for its clinical trial to support accelerated approval.

16

**B.      Rocket Pharma's Trade Secrets**

55.      Rocket Pharma's manufacturing processes, AAV optimization research, competitive business information, health authority submissions and correspondences, and clinical trial data and design are the result of its extensive research and development in its AAV gene and LVV cell therapy programs. Rocket Pharma's significant investments over the past eight years have generated substantial know-how in the form of confidential and proprietary trade secrets.

56.      The highly confidential documents and materials misappropriated by Lexeo's hires of former Rocket Pharma employees, and by extension Lexeo, include detailed technical requirements and specifications regarding the manufacturing processes and competitive business intelligence as set forth in this section below.

**i.      AAV and LVV Manufacturing Processes**

57.      Rocket Pharma's manufacturing processes for AAV viral vectors are the result of extensive time-consuming and expensive research. Rocket Pharma's efforts generated substantial know-how in the form of confidential and proprietary trade secrets. AAV manufacturing is extremely complex and time-consuming because it requires the optimization of multiple steps, with each step having a wide range of variables and pitfalls that affect the overall process. Rocket Pharma's efforts generated valuable know-how in the form of confidential and proprietary trade secrets in both the optimization and execution of each step of the process.

58.      The trade secrets include the technical know-how to run the entire process efficiently, as well as protocols, instrument designs, and data related to each step of the process. Specific examples of the trade secrets include, but are not limited to:

1.   Cell line production methods and data, cell culturing conditions, formulation, purification protocols, potency assays, harvesting methods and protocols, expected yields, and quality testing and sampling techniques for the AAVs and LVVs;

2.   Equipment (including care, maintenance, and operating parameters), operating

protocols for the equipment, materials, control parameters, and step-by-step instructions;

3.    Detailed description of know-how and experience to bring a new manufacturing system online, and the development of a manufacturing system; and

4.    Business information related to the AAV and LVV manufacturing processes such as the contact information, pricing information, and operating procedures from consultants hired to help develop the manufacturing processes.

59.    Such information is the culmination of almost a decade of research and tens of millions of dollars of investment. The information gives Rocket Pharma the ability to cut down on manufacturing costs and shortens the duration of time required to prepare a target therapy for data collection and investigation. The shortened manufacturing time gives Rocket Pharma a significant advantage over competitors who do not have their own manufacturing facilities and are interested in developing similar AAV gene therapy programs.

60.    For example, Mr. Law stole an email communication between him and another Rocket Pharma employee detailing Rocket Pharma's titration experiments, noting the differences between its protocol and the standard protocol used in the field. The email also contains an attachment with AAV genome titration experimental data conducted in-house. Titration experiments are used to determine how much of the target gene and gene editing tools make it into the AAV vector. These protocols and data are critical in determining the efficacy and dosing information needed to produce a successful AAV gene therapy treatment.

61.    As an additional example, Mr. Law stole a document marked "CONFIDENTIAL" and titled "REQUEST FOR PROPOSAL Contract Manufacturing AAV GMP Manufacturing." The document detailed aspects of Rocket Pharma's upstream and downstream manufacturing processes, noting the steps of the cell culturing processes and how long it takes Rocket Pharma to complete each step. The document also contained confidential dosing-related information. The contacts and substance within this document could be used to improve aspects of an AAV manufacturing process

and supply a competitor with the identity and pricing information of collaborators who can improve the manufacturing process, saving the competitor time and money in fostering the business relations and negotiations on its own.

### ii.  AAV Optimization Research

62.     Rocket Pharma invested an extensive amount of time, research, effort, and money in identifying, selecting, modifying, and designing AAV viral vector constructs to improve the delivery and efficacy of therapeutics to specific targets, such as cardiac cells. Rocket Pharma's efforts generated substantial know-how in the form of confidential and proprietary trade secrets. The trade secrets allowed Rocket Pharma to develop successful AAV gene therapy treatments.

63.     The trade secrets include, but are not limited to, comparison assays, experimental data, serotype selection experiments, optimized genomes for viral vectors, plasmid ratios and concentrations, plasmid design, experimental know-how, and business information.

64.     As a specific example, Mr. Law stole a document titled "CERTIFICATE OF ANALYSIS small-scale Plasmid DNA." This document contains data from a third-party collaborator that ran an analysis experiment on one of Rocket Pharma's plasmids used in an AAV gene therapy treatment. The document discloses the plasmid design and modifications along with formulation information. This information can be used by a competitor to guide experiments and modifications when designing its plasmid. Plasmid design is an important aspect of the AAV gene therapy program process because successful plasmid design is a factor in creating a successful therapeutic.

65.     Rocket Pharma has been selecting and designing viral vectors, including LVVs and AAVs, since the inception of the company almost a decade ago. The information learned has allowed Rocket Pharma to advance multiple AAV gene therapy treatments into the clinical trial phase.

### iii.    Investigational AAV Gene Therapy Target Information

66.     Rocket Pharma invested significant time and other resources in developing a wide range of AAV-based gene therapy treatments. Each treatment requires extensive preclinical investigation and data collection before reaching the clinical trial phase. Rocket Pharma's efforts have generated substantial know-how in the form of confidential and proprietary trade secrets. These secrets build off each other, and successful experimental designs and partnerships help expedite the approval of future therapeutics.

67.     The trade secrets include, but are not limited to, the AAV modifications, preclinical experimental design, clinical trial design, animal model data, patient data, patient protocols, patient identification data, a list of clinical trial collaborators and partners, clinical trial contacts, dosage and formulation information, drug storage and preparation protocols, drug administration protocols, sample processing logs, shipping procedures, patient data, chain of custody forms, potency assays, and pricing and contact information of collaborators.

68.     This information is crucial for the development of new therapeutics and significantly decreases the development time for them. Because there are many competitors developing AAV cell and gene therapies, there is a massive advantage in being the first to market, making this information extremely valuable for Rocket Pharma or any competitor trying to enter the market.

69.     Rocket Pharma developed a clinical trial infrastructure specific to AAV therapies to ensure therapies are safely delivered from the manufacturing lab to the patients in clinical trial sites worldwide. To develop this infrastructure, Rocket Pharma formed strategic partnerships with shipping and processing specialists and worked with these collaborators to develop confidential protocols. Furthermore, Rocket Pharma dedicated an entire team of employees to studying the shipping and storage logistics. These partnerships and protocols are vital to ensure successful drug

delivery, especially because each individual drug costs millions of dollars to produce. If a drug delivery is delayed by just a few hours, or stored at the incorrect conditions, it must be discarded, which would cost Rocket Pharma millions between the lost products and remanufacturing. These efforts have resulted in trade secrets such as the pricing negotiation information and contact information of these collaborations as well as the confidential shipping and storage protocols used to ensure safe drug delivery.

70.     As a specific example, Mr. Law stole a document marked "Proprietary" and titled "AVV Drug Product Infusion Preparation, Standard Operating Procedure." This document detailed Rocket Pharma's Standard Operating Procedure for dose calculation, distribution, and infusion preparation instructions for AAV gene therapies. The document details each step of the procedures and details the required equipment needed. As explained earlier, the shipping and preparation protocols are critical for ensuring safe drug delivery to the patients and represent millions in the form of lost product and developmental costs.

### C.     Rocket Pharma Protects Its Confidential and Proprietary Trade Secrets

71.     Rocket Pharma has undertaken, and continues to undertake, significant measures to maintain the secrecy of its confidential and trade secret information. Rocket Pharma keeps much of its research and development relating to its manufacturing processes, AAV and LVV optimization research, and clinical trials as trade secrets. This information cannot be reverse engineered and derives independent economic value from not being generally known or readily ascertainable because they enable the possessor of the information to correctly perform the manufacturing process and to do so efficiently.

72.     Rocket Pharma maintains strict confidentiality of trade secrets through various measures. As an initial matter, Rocket Pharma requires all employees to sign an agreement with non-disclosure and restricted use obligations, requiring all executing parties to maintain the

confidentiality of Rocket Pharma's proprietary information. The agreements expressly indicate that the signatory "understand[s] and acknowledge[s] that my employment by the Company creates a relationship of confidence and trust with respect to the Company Group's Proprietary Information (as defined below) and that the Company has a protectable interest therein." The agreements also require employees leaving Rocket Pharma to inform Rocket Pharma of their new employer, which allows Rocket Pharma to evaluate the potential risk of disclosure in the employee's new role. Rocket Pharma takes the obligations of these agreements seriously and enforces compliance with them when necessary.

73.     Rocket Pharma takes many other measures to protect the confidentiality of its proprietary information as well. For example, Rocket Pharma only discloses proprietary information to its employees on a need-to-know basis, depending on the role the employee has with respect to a certain project. In addition to restricting access to physical files containing proprietary information, this policy also includes limiting access to key SharePoint folders containing proprietary information to only specific employees and limiting those who can grant access to such folders. In addition, this policy included limiting or restricting access to physical locations in the research and development and manufacturing facility in Cranbury, New Jersey, and the corporate offices in the Empire State Building. Limitation or restriction to physical locations, as well as tracking of access to physical locations, is achieved through the use of key fobs required to access different areas of the facilities and through maintaining records of visitors to the facilities. Rocket Pharma employs strict physical security measures beyond controlled key fob access, including the use of security professionals and video surveillance systems to monitor its facilities.

74.     While Rocket Pharma works with various third parties, it restricts the disclosure of proprietary information to such third parties and provides disclosure of trade secret information only when necessary. Rocket Pharma requires all third parties to sign confidential disclosure agreements

obligating the third parties to maintain the confidentiality of any proprietary information they receive.

### D.    Mr. Law and Ms. Gutierrez Helped Develop and Had Access to Rocket Pharma's Confidential and Proprietary Trade Secrets

75.    Mr. Law joined Rocket Pharma as a Scientist in October 2016. He was hired to support CMC, including drafting IND submissions; manage GMP production of LVVs; oversee the preparation of manufacturing, supply chain, and analytics for drug product as well as clinical trials; generate analytical statements of procedures for clinical trials; perform in-house analytical testing for vendor comparisons and regulatory submissions; collaborate with commercial partners through training and assay development and qualifications; develop testing qualification for plasmids, implement and manage Rocket Pharma's quality systems; and manage CMC vendor purchase order and payment processes.

76.    His role soon expanded to support AAV analytics and potency assays. Two years later, he was promoted to Senior Scientist in the CMC and Analytical Development department. While in this position, Mr. Law helped establish qualified assays for the LVV programs; supported supply chain and logistics for the LVV programs; provided support to programs in patient treatment; ensured that vector test methods were fully qualified prior to initiating Phase I studies; developed assays for patient analytical testing; provided scientific and analytical support for the internal buildout of the New Jersey facility, including assisting with employee onboarding and equipment implementation and implementing quality control measures; managing patient treatment and regulatory timelines; and developing analytical testing and potency assays for several programs.

77.    Later that same year, Mr. Law was promoted again, becoming an Associate Director of CMC and Analytical Development. His responsibilities in this role were to oversee the design, development, and qualification of analytical methods to assess product identity, purity, quality and potency for the company's portfolio of preclinical and clinical-stage programs; oversee

assay qualification and validation, including through collaboration partner organizations; support the CMC and product development teams in data analysis, GMP method implementation, and broad incorporation of analytical strategy within CMC functions; lead various aspects of method development, transfer, characterization, investigation and assay validation; maintain awareness of cGMP guidance documents and industry standards; author and review documents, including development reports, SOPs, assay transfer protocols/reports, CMC sections of regulatory filings (IND, IMPD, BLA, etc.), and scientific journal publications; and collaborate closely with the discovery, process development, quality, and regulatory teams.

78.     Through his role as Associate Director, Mr. Law gained intimate knowledge of and had access to a wide range of Rocket Pharma's trade secrets, including all aspects of Rocket Pharma's CMC, analytics, supply chain, and clinical trial information for both the AAV and the LVV programs. He learned and directed how Rocket Pharma sets up components and operates, monitors, and adjusts the equipment throughout the process. He had a role in most aspects of overall CMC and Rocket Pharma activities. In addition, Mr. Law worked directly with confidential third-party collaborators, coordinated clinical trials, developed the qualification of vector analysis and test methods, and established standard operating procedures. Moreover, Mr. Law provided scientific and analytical support for the buildout of Rocket Pharma's GMP facility, and through this process, gained exposure to Rocket Pharma's know-how regarding the implementation of equipment, the development of clinically ready manufacturing documentation for GMP manufacturing, and the development of standard operating procedures.

79.     Lexeo also hired Ms. Gutierrez, who similarly was involved in the development of, and had access to, Rocket Pharma trade secrets. Ms. Gutierrez joined Rocket Pharma as a Scientist in October 2018 and also had access to a wide range of Rocket Pharma trade secrets. Ms. Gutierrez was responsible for the development of AAV analytics, including qPCR for AAV titration and

infectivity assays; isolation of material from clinical samples; characterization of all preclinical AAV lots; overseeing AAV contracts with CMOs and vector supply for preclinical studies; analysis of studies to support capsid and promoter selection for transfer to the Analytics group; developing internal process controls for GMP production; upstream process development; and generating the lab preclinical AAV inventory.

80.     In January 2020, Ms. Gutierrez was promoted to Senior Scientist. In this role, Ms. Gutierrez helped develop quantification methods for *in vivo* samples, supported the analyses for preclinical studies and generated pivotal nonclinical data, participated in IND report writing, and supported process development activities outsourced at various vendors, including the development of a packaging/producer cell line for AAV production. Ms. Gutierrez also supported the expansion of the capabilities of the R&D lab to do reliable analytics in-house, especially for AAV quantification as well as potency assay development, and Ms. Gutierrez herself noted that "[t]hese assays will hopefully support R&D and PD [product development] activities, and will allow [Rocket Pharma] to move the AAV pipeline forward faster and in a more cost-effective manner."

81.     Ms. Gutierrez's experience and exposure to Rocket Pharma confidential information in, at least, upstream R&D and understanding of how process development advances the AAV pipeline provided the ideal complementary skillset to Mr. Law's experience and exposure to Rocket Pharma confidential information in, at least, understanding of the downstream GMP manufacturing process. Lexeo hired those two employees who, together, had some of the most intimate knowledge of Rocket Pharma's entire workflow and knew how to capitalize on that knowledge for Lexeo's benefit.

E.    **Mr. Law and Ms. Gutierrez Were Obligated to Protect the Secrecy of Rocket Pharma's Confidential and Proprietary Trade Secrets and Disclose Their New Place of Employment**

82.    Mr. Law and Ms. Gutierrez were obligated to maintain the confidentiality of Rocket Pharma's proprietary information and inform Rocket Pharma of their new employer, which allows Rocket Pharma to evaluate the potential risk of disclosure in the employee's new role.

83.    Mr. Law entered the Law Agreement on October 13, 2016, in which he agreed to maintain the confidentiality of Rocket Pharma's confidential and proprietary information.[7] Furthermore, the Law Agreement required Mr. Law to inform Rocket Pharma of his new employer upon departure.[8] This would allow Rocket Pharma to evaluate the risks of disclosure in the new role and take the appropriate measures.

84.    Ms. Gutierrez entered into the Gutierrez Agreement with Rocket Pharma on October 1, 2018, in which she agreed to maintain the confidentiality of Rocket Pharma's confidential and proprietary information.[9] Likewise, the Gutierrez Agreement required Ms. Gutierrez to inform Rocket Pharma of her new employer upon a departure.[10] Just as with the Law Agreement, the Gutierrez Agreement would allow Rocket Pharma to evaluate the risks of disclosure in the new role and take appropriate measures.

85.    Under these Agreements, Mr. Law and Ms. Gutierrez recognized that their employment by Rocket Pharma created a relationship of confidence and trust with respect to Rocket Pharma's confidential and proprietary information and that Rocket Pharma has a protectable interest therein.[11]

---

[7] *See* Mr. Law Proprietary Information, Inventions and Non-Solicitation/Non-Competition Agreement, ¶ 1.1 (signed Oct. 13, 2016) ("Mr. Law PIIA").
[8] *Id.*, ¶ 12.2.
[9] *See* Ms. Gutierrez Proprietary Information, Inventions and Non-Solicitation/Non-Competition Agreement, ¶ 1.1 (signed Oct. 1, 2018) ("Ms. Gutierrez PIIA").
[10] *Id.*, ¶ 14.2.
[11] Mr. Law PIIA, ¶ 1.1; Ms. Gutierrez PIIA, ¶ 1.1.

86.     Under the Agreements, Mr. Law and Ms. Gutierrez recognized that proprietary information meant any and all confidential and/or proprietary knowledge, data, or information of Rocket Pharma, whether having existed at the time Mr. Law and Ms. Gutierrez signed the Agreements or developed during their respective employment by Rocket Pharma.[12]

87.     Under the Agreements, Mr. Law and Ms. Gutierrez recognized that such proprietary information included trade secrets, inventions, ideas, processes, formulae, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques.[13]

88.     Under the Agreements, Mr. Law and Ms. Gutierrez agreed to hold Rocket Pharma's proprietary information in the strictest confidence and not directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information, except as such disclosure, use, or publication may be required for their work for Rocket Pharma.[14]

89.     Under the Agreements, Mr. Law and Ms. Gutierrez agreed never to use or disclose Rocket Pharma's proprietary information.[15]

90.     Under the Law Agreement, Mr. Law agreed that, when he left the employment of Rocket Pharma, he would deliver to Rocket Pharma any and all property of Rocket Pharma that was in his possession or control, provided to him by Rocket Pharma, or prepared by Mr. Law, including drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any of Rocket Pharma's proprietary information, inventions, or third-party information. Ms. Gutierrez agreed to such conditions as well in the Gutierrez Agreement.[16]

---

[12] Mr. Law PIIA, ¶ 1.2; Ms. Gutierrez PIIA, ¶ 1.2.
[13] Mr. Law PIIA, ¶ 1.2; Ms. Gutierrez PIIA, ¶ 1.2.
[14] Mr. Law PIIA, ¶ 1.1; Ms. Gutierrez PIIA, ¶ 1.1.
[15] Mr. Law PIIA, ¶ 1.1; Ms. Gutierrez PIIA, ¶ 1.1.
[16] Mr. Law PIIA, ¶ 9; Ms. Gutierrez PIAA, ¶ 9.

91.     Under the Agreements, Mr. Law and Ms. Gutierrez agreed that any threatened or actual violation of the Agreements or any of their terms would constitute immediate and irreparable injury to Rocket Pharma and that Rocket Pharma would have the right to enforce the Agreements and any of their provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Rocket Pharma may have for a breach or threatened breach of the Agreements.[17]

92.     Under the Agreements, Mr. Law and Ms. Gutierrez agreed that the provisions of the Agreements would survive the termination of their employment, regardless of the reason.[18]

93.     Mr. Law and Ms. Gutierrez violated the Agreements by transferring large volumes of confidential information to their personal devices, disclosing Rocket Pharma proprietary and confidential trade secret information to Lexeo, and by failing to disclose they were leaving Rocket Pharma to work at Lexeo.

**F.     Mr. Law and Ms. Gutierrez Secretly Sent Rocket Pharma's Confidential and Proprietary Trade Secrets to Their Personal Devices Before Departing Rocket Pharma**

94.     As discussed generally above, on September 24, 2021, shortly after receiving his offer letter from Lexeo, unbeknownst to Rocket Pharma, Mr. Law created a folder on his Rocket Pharma computer to which he uploaded 122,987 Rocket Pharma emails and documents. The following day, Mr. Law transferred these work-related emails and documents to his personal computer. Given his role with Rocket Pharma and the Law Agreement, Mr. Law knew that this information was owned by Rocket Pharma and was confidential and proprietary Rocket Pharma information. Many of the documents were expressly marked "CONFIDENTIAL."

95.     The emails that Mr. Law improperly copied contained a wide range of Rocket

---

[17] Mr. Law PIIA, ¶ 10.1; Ms. Gutierrez PIIA, ¶ 12.1.
[18] Mr. Law PIIA, ¶ 13.4; Ms. Gutierrez PIIA, ¶ 15.4.

Pharma's highly confidential and proprietary information, including, but not limited to, clinical trial contacts, clinical trial study designs, patient data from clinical trials, clinical trial protocols and study designs, cell counts, processing logs, chain of custody forms, manufacturing order forms, annotated floor plans for Rocket Pharma's manufacturing laboratories, shipping protocols and forms, potency assays, manufacturing partnerships, business contacts, and pricing documents related to Rocket Pharma's collaborations. These emails and attachments contain detailed information about Rocket Pharma's manufacturing processes and clinical trial information that was the result of nearly a decade of research and tens of millions of dollars of investment. The emails contain extensive logistical information and material for the clinical trials such as shipping and delivery protocols, contacts with clinical trial sites, dosage information, and patients' cell data—all of which represent and memorialize confidential Rocket Pharma information that Mr. Law was exposed to while at Rocket Pharma.

96.     On his last day of work at Rocket Pharma, Mr. Law inserted two USB drives that had over a terabyte's worth of storage into his Rocket Pharma computer. On information and belief, Mr. Law downloaded additional Rocket Pharma files onto the drives. Furthermore, and against Rocket Pharma policy, Mr. Law used an application called TimeMachine. On information and belief, he used this application to back up his entire Rocket Pharma computer to an unauthorized external hard drive.

97.     As discussed generally above, Mr. Law's nefarious activities did not stop there. Mr. Law downloaded unauthorized applications, "AppCleaner" and "Nektony App Cleaner," which uninstall unwanted applications. Mr. Law accessed AppCleaner on October 10, 2021, when he was just days away from departing from Rocket Pharma and well underway with his plan to steal Rocket Pharma's trade secrets. On information and belief, Mr. Law used these applications to delete the trace of additional applications that may have been used to cover up unauthorized file transfers to

his personal computer.

98.     Downloading external applications, such as AppCleaner and Nektony App Cleaner, is expressly prohibited. Rocket Pharma implemented its Computer and Network Security Policy ("IT policy") on September 30, 2020, well before Mr. Law accessed AppCleaner prior to his departure.[19] Mr. Law reviewed and acknowledged this IT policy on May 9, 2021, and Ms. Gutierrez reviewed and acknowledged this policy on May 27, 2020. Mr. Law also reviewed and acknowledged the IT Acceptable Use Policy on September 22, 2020, and Ms. Gutierrez reviewed and acknowledged the IT Acceptable Use Policy on May 27, 2020.

99.     Section 3.3.6 of the Computer and Network Security Policy prohibits employees from downloading unauthorized software on company-issued computers.[20] Mr. Law never requested, nor received, authorization to download the applications and, therefore, violated Rocket Pharma's IT policy. Similarly, § 3.1.2 of the Computer and Network Security Policy prohibits employees from "[a]ccessing, disclosing, deleting, altering or appropriating computer data without a legitimate, authorized Company business purpose." Neither Mr. Law nor Ms. Gutierrez ever requested or received authorization to send Rocket Pharma computer files to their personal devices or to access the files from their personal devices.

100.    As discussed generally above, on his last day of work at Rocket Pharma, October 15, 2021, Mr. Law took pictures of sensitive Rocket Pharma information from another employee's lab notebook. The pictures covered proprietary lab protocols, cell culture techniques, and cell data related to AAV and LVV cell and gene therapy development.

101.    Mr. Law took files containing Rocket Pharma's confidential and proprietary trade secret information, and unbeknownst to Rocket Pharma, on information and belief, Mr. Law used

---

[19] Rocket Pharmaceuticals, Inc., Computer and Network Security Policy (Sept. 30, 2020).
[20] *Id*., § 3.3.6.

them and other highly confidential and proprietary trade secrets he learned through his work at Rocket Pharma in his similar role at Lexeo. Mr. Law's efforts to transmit large volumes of Rocket Pharma trade secrets to his personal device and his attempt to hide these efforts with unauthorized applications demonstrate that Mr. Law ascribed a high value to this information, value for which Lexeo targeted him.

102.    Mr. Law did not stop there. After he started work at Lexeo, Mr. Law tried to recruit multiple Rocket Pharma team members to join him at Lexeo, many of whom were working on AAV cardiac programs. On information and belief, Mr. Law's attempts to recruit additional Rocket Pharma employees was at Lexeo's direction.

103.    As discussed above, in violation of the Gutierrez Agreement and Rocket Pharma policies, Ms. Gutierrez sent various emails containing Rocket Pharma's confidential information to her personal Gmail account. The emails contained confidential information related to the AAV manufacturing process and AAV research, including a link which contained every file her supervisor ever generated at Rocket.

**G.    Lexeo Misappropriated Rocket Pharma's Confidential and Proprietary Trade Secrets**

104.    Based on information and belief, Lexeo misappropriated Rocket Pharma's confidential and proprietary trade secret information to gain data, technology, and know-how to assist with the development of its AAV gene therapies and to manufacture therapies with lower costs and faster development times.

105.    Lexeo was formed in 2017 with the goal of developing AAV gene therapies.[21] By this time, Rocket Pharma already secured Series A funding and was in the preclinical stage for multiple cell and gene therapy-based treatments. On information and belief, Lexeo sought out two

---

[21] D&B Hoovers. LEXEO THERAPEUTICS, INC. Retrieved September 21, 2023.

Rocket Pharma employees who had firsthand knowledge of how to develop a successful AAV gene therapy program. Lexeo interviewed and hired the two Rocket Pharma employees who it knew would be able to help Lexeo speed up the production and development of existing AAV gene therapies, as well as help identify and develop new therapies, by using the confidential and proprietary information of their competitor, Rocket Pharma.

106.    In the interval between Lexeo's offer of employment and his departure from Rocket Pharma weeks later, Mr. Law not only had access to a wide range of Rocket Pharma's trade secret and confidential information, but he downloaded 122,987 documents to his personal device that contained Rocket Pharma's confidential and proprietary trade secret information—all of which he knew would be tremendously valuable to Lexeo.

107.    When Mr. Law joined Lexeo, Rocket Pharma was well underway in multiple clinical trials for AAV gene therapies, whereas Lexeo's clinical trial programs were significantly less developed. For example, Lexeo had obtained only preclinical data on LX2006, which it purchased from Adverum Biotechnologies, and lacked the clinical data Rocket Pharma had obtained and the cGMP certification Rocket Pharma would soon achieve.[22]

108.    Lexeo welcomed the proprietary information Mr. Law obtained through the highly specialized training he received at Rocket Pharma. But even more valuable than that were the trade secrets Mr. Law brought with him from Rocket Pharma. Despite its representations to the contrary, Lexeo tasked Mr. Law with developing and overseeing AAV programs in the cardiac space as evidenced by his 2023 poster presentation.[23] Less than a year after hiring Mr. Law, progress on Lexeo's AAV cardiac candidate LX-2006 suddenly advanced significantly, entering phase 1 clinical

---

[22] Adverum Biotechnologies Press Release.
[23] Lexeo Therapeutics, Vector Biodistribution and Transgene Expression in the Heart Following Gene Transfer of AAVrh.10 vs. AAV9 Capsids, ASGCT (May 16-20, 2023) ("Lexeo Poster Presentation").

trials on August 24, 2022.[24]

109.     Lexeo used Mr. Law's extensive knowledge and background regarding Rocket Pharma's manufacturing process, including Rocket Pharma's confidential and proprietary trade secret information, to develop and execute manufacturing and clinical trials for LX-2006. Further, the thousands of Rocket Pharma trade secrets that Mr. Law stole would aid or assist Lexeo in developing and executing Lexeo's manufacturing process for LX-2006 and other therapies.

110.     Lexeo knew or had reason to know that the Rocket Pharma trade secrets were acquired by improper means, including through at least Mr. Law and Ms. Gutierrez. Specifically, by way of at least Mr. Law's acts in furtherance of his employment for Lexeo, Lexeo knowingly and wrongfully acquired and then disclosed and/or used Rocket Pharma's trade secrets without express or implied consent by Rocket Pharma. Lexeo knew or had reason to know that Rocket Pharma trade secrets were derived from or through former Rocket Pharma employees, persons who had used improper means to acquire Rocket Pharma trade secrets, and who acquired Rocket Pharma information under circumstances giving rise to a duty to maintain the secrecy of the information and limit the use of the information. Lexeo's decision to specifically hire a manufacturing leader in the CMC area who specialized in the manufacturing process for the AAV treatment of a heart condition it was looking to develop, as well as a scientist significantly involved in up-stream product development and the implementation of the manufacturing process, was without regard to protecting Rocket Pharma confidential information and rather to improperly access and use such information, as demonstrated by at least Lexeo's misrepresentations to Rocket Pharma regarding Mr. Law's role at the company. Lexeo's misrepresentation was eventually made apparent by the Lexeo poster with ex-Rocket Pharma employees listed as authors in the same AAV gene therapy in the heart.[25]

---

[24] *See* National Library of Medicine, Gene Therapy for Cardiomyopathy Associated With Friedreich's Ataxia, Clinical Trial NCT05445323, https://clinicaltrials.gov/study/NCT05445323.
[25] Lexeo Poster Presentation.

111.    Mr. Law, in the few days he had left at Rocket Pharma after securing his position at Lexeo, downloaded information related to AAV therapies for several other conditions. Namely, Rocket Pharma developed an AAV therapy for PKP2-ACM. To date, Rocket Pharma has invested tens of millions of dollars in developing its PKP2 therapy. Rocket Pharma spent years discovering and producing preclinical data for its PKP2 therapy. Rocket Pharma began researching this therapy as far back as 2020.

112.    By the time Mr. Law left in 2021, Rocket Pharma had already designed and produced PKP2 AAV vector constructs for *in vivo* evaluation and launched its nonclinical PKP2 program. Rocket Pharma had also established proof-of-concept in animal models, confirmed the expression of PKP2 with candidate vectors and selected two lead vectors, and designed and launched subsequent *in vivo* proof-of-concept efficacy studies. Moreover, at that time, Rocket Pharma already had developed plans to conduct additional efficacy and dose range finding studies, produce safety/toxicology vector lots, and complete the nonclinical development program with an IND filing. Rocket Pharma had also vetted and begun discussions with potential collaborators regarding clinical trial support and design.

113.    On information and belief, Lexeo welcomed Mr. Law's expertise and misappropriated confidential and proprietary trade secrets relating to AAV clinical trial programs that would substantially aid Lexeo's PKP2 program. Specifically, and in addition to stolen patient data marked confidential from multiple clinical trials, Mr. Law took documents that detailed Rocket Pharma's AAV clinical trial design with collaborator contact and pricing information, as well as specific shipping and handling operating procedures used to optimize the drug delivery process. This information would be instrumental in accelerating an AAV gene therapy program, and if successful, would grant first-to-market advantages for the therapy. On August 1, 2023, Lexeo announced FDA clearance of an AAV-based gene therapy treatment designed to deliver a functional

PKP2 gene to cardiac muscle cells to treat arrhythmogenic cardiomyopathy, the same target as Rocket Pharma's AAV-based PKP2 therapy program.[26] In its September 29, 2023, Form S-1 submitted to the Securities and Exchange Commission in advance of going public, Lexeo touted its PKP2 therapy, publicizing to prospective investors and the general public that the therapy "received IND clearance from the U.S. Food and Drug Administration, or FDA, in July 2023 and we expect to dose the first patient in a Phase 1/2 clinical trial in the first half of 2024 and provide an interim data readout from cohort 1 in the second half of 2024."[27]

114.    Lexeo also specifically pointed to its manufacturing process, which was established based on know-how and expertise developed at Rocket Pharma, as enabling it "to efficiently pursue [its] goal of targeting larger-rare and prevalent patient populations."[28] In its S-1, Lexeo claimed to be "led by pioneers and experts with decades of collective experience in genetic medicines, rare disease drug development, manufacturing and commercialization."[29]

115.    On information and belief, Lexeo could not have independently developed its PKP2 gene therapy program, particularly in the timeframe it did, without the wrongful acquisition and use of Rocket Pharma's trade secrets. Instead, Lexeo chose to misappropriate Rocket Pharma's trade secrets through Mr. Law and Ms. Gutierrez.

---

[26] FDA Clearance of LX2020.

[27] Lexeo Therapeutics, Inc. Registration Statement (Form S-1), at 120 (Sept. 29, 2023), https://www.sec.gov/Archives/edgar/data/1907108/000119312523247367/d287237ds1.htm#toc287237_10.

[28] *Id.* at 7.

[29] *Id.*

###### i. Rocket Pharma's Trade Secrets Continue to Provide an Advantage to Lexeo for Its Future Programs

116.    Although Lexeo's publicly announced programs are AAV-based, Mr. Law also stole thousands of documents from Rocket Pharma relating to LVV-based cell therapies.

117.    Unlike AAV-based therapies where the therapeutic gene is delivered directly to cells within a patient's body, in LVV therapies, the patient's cells are removed, the LVV is then introduced to the cells "*ex vivo*," and then the transduced cells are placed back into the patient once corrected. Accordingly, there is a great deal of research and development that goes into the methods of extracting, purifying, and ensuring appropriate gene transfer to patients' cells.

118.    The stolen documents include valuable cell processing and dosing information from multiple clinical trials such as the trials for RP-L201 and RP-L401. These documents included patient data, dosing calculations, validation data, shipping vendors and protocols, and drug preparation protocols. Many of these documents were marked "CONFIDENTIAL."

119.    Furthermore, Rocket Pharma relies on partnerships with manufacturing companies to produce its LVV therapies. Rocket Pharma's business contacts and pricing agreements with the manufacturers are the result of years of negotiations and careful identification, investigation, and vetting regarding the specialized companies that could perform such sensitive work. Mr. Law stole confidential documents with information related to these business contacts and pricing negotiations.

120.    Armed with Rocket Pharma trade secrets, upon information and belief, Lexeo could save almost a decade's worth of research and development and establish an AAV-based cell therapy pipeline with therapies that directly compete with those of Rocket Pharma.

## COUNT I

### Trade Secret Misappropriation Under the Defend Trade Secrets Act (18 U.S.C. §§ 1836(b), 1839 et seq.) (AS TO ALL DEFENDANTS)

121.    Rocket Pharma incorporates and re-alleges each and every allegation above as if fully set forth herein.

122.    Rocket Pharma is the owner of certain valuable trade secrets relating to the development and manufacture of AAV gene and LVV cell therapies. These confidential and proprietary trade secrets are of substantial independent economic value by virtue of their secrecy, and they have conferred a competitive advantage on Rocket Pharma.

123.    Rocket Pharma's trade secrets are not generally known to, and are not readily ascertainable through proper means by, competitors in the industry or anyone else who could obtain economic value from their disclosure or use.

124.    Rocket Pharma's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

125.    Mr. Law and Ms. Gutierrez had access to Rocket Pharma's confidential and proprietary information, which includes its trade secrets such as AAV manufacturing and clinical trial-related trade secrets.

126.    Mr. Law and Ms. Gutierrez improperly accessed, disclosed, and used Rocket Pharma's trade secrets at least when Mr. Law and Ms. Gutierrez sent themselves Rocket Pharma's confidential information. Specifically, Mr. Law sent himself 122,987 documents, many of which were marked "CONFIDENTIAL." Ms. Gutierrez forwarded from her Rocket Pharma email to her

personal Gmail links and copies of AAV research data.

127.     Rocket Pharma has taken reasonable measures to protect its trade secrets by restricting access to information on a need-to-know basis, requiring all employees to sign the agreements that require all executing parties to maintain the confidentiality of Rocket Pharma's proprietary information and to limit access and use of such information, restricting physical access to Rocket Pharma facilities containing proprietary information, restricting virtual access to Rocket Pharma networks and devices containing proprietary information, instituting policies regarding use of IT equipment and protection of proprietary information, and restricting access to ShareFiles and data folders based on a need-to-know basis based on an employee's job responsibilities.

128.     Both Mr. Law and Ms. Gutierrez signed the Agreements, which prohibited the unauthorized access and use of proprietary information and required that they maintain the confidentiality of Rocket Pharma's confidential and proprietary information. Both Mr. Law and Ms. Gutierrez transmitted Rocket Pharma's confidential information to their personal devices in violation of their obligations to Rocket Pharma. Both Mr. Law and Ms. Gutierrez knew or should have known that such actions were improper. The timing, volume, and extent of the majority of this unauthorized access, use, and disclosure, on the eve of their departures to a competitor, further demonstrates the impropriety of their conduct.

129.     Once Rocket Pharma learned that Lexeo hired Mr. Law, Rocket Pharma sent Lexeo a letter warning Lexeo that Mr. Law was exposed to Rocket Pharma's confidential information, including its trade secrets. Therefore, Lexeo had actual knowledge that Mr. Law possessed Rocket Pharma's trade secrets. Despite this, Lexeo further took advantage of Mr. Law's knowledge by giving him the same job responsibilities on overlapping and competing projects.

130.     Lexeo also had constructive knowledge that Ms. Gutierrez was exposed to Rocket Pharma's confidential information, including its trade secrets. Despite this, on information and

belief, Lexeo took advantage of Ms. Gutierrez's knowledge by giving her substantially similar job responsibilities on competing products.

131. On information and belief, Lexeo knowingly and directly targeted Mr. Law and Ms. Gutierrez, and enabled and encouraged Mr. Law and Ms. Gutierrez to work together, with others at Lexeo, on projects that would involve Mr. Law's and Ms. Gutierrez's improper access, disclosure, and use of Rocket Pharma trade secret information.

132. Lexeo directly misappropriated Rocket Pharma's confidential information, including its trade secrets, without consent.

133. Separately, in addition to its direct misappropriation of Rocket Pharma trade secrets, Lexeo is responsible for the misappropriation committed by its employees, including Mr. Law and Ms. Gutierrez. Lexeo knowingly targeted Mr. Law and Ms. Gutierrez and placed Mr. Law and Ms. Gutierrez in roles in which their use of Rocket Pharma proprietary information would be necessary and foreseeable.

134. Defendants' misappropriation has been willful and malicious.

135. Rocket Pharma has been harmed by the conduct of Lexeo, Mr. Law, and Ms. Gutierrez. The value of Rocket Pharma's commercial and regulatory progress has been eroded by a competitor gaining commercial and regulatory shortcuts through misappropriation. The misappropriated trade secrets have been used by the Defendants to develop and enable products in competition with Rocket Pharma.

136. Defendants have been and continue to be unjustly enriched by their misappropriation of Rocket Pharma's confidential information and trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, disclose, acquire, and/or otherwise misappropriate Rocket Pharma's trade secrets.

WHEREFORE, Rocket Pharma respectfully requests that this Court:

1.  Issue an order directing Defendants and any others acting in concert with them to return to Rocket Pharma all of Rocket Pharma's confidential, trade secret, and proprietary information in their possession, including any information derived from Rocket Pharma's misappropriated information.

2.  Issue an order directing Defendants and any others acting in concert with them to refrain from accessing, using, disclosing, or disseminating Rocket Pharma's confidential, trade secret, and proprietary information, including any information derived from Rocket Pharma's misappropriated information.

3.  Issue an order directing Defendants and any others acting in concert with them to provide an accounting of those to whom they have disclosed Rocket Pharma's confidential, trade secret, and proprietary information and to certify the steps they have taken to demand the return and destruction of documents and materials containing such information.

4.  Issue an order directing Lexeo to refrain from competing and working in the market for AAV gene and LVV cell therapy treatments targeting cardiac diseases.

5.  Award Rocket Pharma damages for misappropriation and exemplary damages for willful misappropriation pursuant to 18 U.S.C. § 1836 et seq.

6.  Award Rocket Pharma attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 et seq.

7.  Award Rocket Pharma damages in an amount to be determined at trial, award all pre-judgment and post-judgment interest allowable by law, award Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and award any such other relief as the Court deems appropriate.

## COUNT II

### Misappropriation of Trade Secrets Under New York Law
### (AS TO ALL DEFENDANTS)

137.    Rocket Pharma incorporates and re-alleges each and every allegation above as if fully set forth herein.

138.    The actions of Defendants as described above constitute violations of New York common law.

139.    Rocket Pharma is the owner of certain valuable trade secrets relating to the development and manufacture of AAV and LVV cell and gene therapies. These confidential and proprietary trade secrets are of substantial independent economic value by virtue of their secrecy, and they have conferred a competitive advantage on Rocket Pharma.

140.    Rocket Pharma's trade secrets are not generally known to, and are not readily ascertainable through proper means by, competitors in the industry or anyone else who could obtain economic value from their disclosure or use.

141.    Rocket Pharma took reasonable steps to maintain the secrecy and confidentiality of its trade secrets and confidential information.

142.    Mr. Law and Ms. Gutierrez had access to Rocket Pharma's trade secrets as a result of their employment and improperly accessed, disclosed, and used Rocket Pharma's trade secrets at least when Mr. Law and Ms. Gutierrez sent themselves Rocket Pharma's confidential information to their personal devices.

143.    On information and belief, Lexeo knowingly and directly targeted Mr. Law and Ms. Gutierrez, and enabled and encouraged Mr. Law and Ms. Gutierrez to work together, with others at Lexeo, on projects that would involve Mr. Law's and Ms. Gutierrez's improper access, disclosure, and use of Rocket Pharma trade secret information.

41

144.    Lexeo directly misappropriated Rocket Pharma's confidential information, including its trade secrets, without consent.

145.    Separately, in addition to its direct misappropriation of Rocket Pharma trade secrets, Lexeo is responsible for the misappropriation committed by its employees, including Mr. Law and Ms. Gutierrez. Lexeo knowingly targeted Mr. Law and Ms. Gutierrez and placed Mr. Law and Ms. Gutierrez in roles that would exploit the use of Rocket Pharma proprietary information.

146.    Defendants' misappropriation has been willful and malicious.

147.    Rocket Pharma has been harmed by the conduct of Lexeo, Mr. Law, and Ms. Gutierrez. The value of Rocket Pharma's commercial and regulatory progress has been eroded by a competitor gaining commercial and regulatory shortcuts through misappropriation. The misappropriated trade secrets have been used by the Defendants to develop and enable products in competition with Rocket Pharma.

148.    Defendants have been and continue to be unjustly enriched by their misappropriation of Rocket Pharma's confidential information and trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, disclose, acquire, and/or otherwise misappropriate Rocket Pharma's trade secrets.

WHEREFORE, Rocket Pharma respectfully requests that this Court:

1.  Issue an order directing Defendants and any others acting in concert with them to return to Rocket Pharma all of Rocket Pharma's confidential, trade secret, and proprietary information in their possession.

2.  Issue an order directing Defendants and any others acting in concert with them to refrain from using, disclosing, or disseminating Rocket Pharma's confidential, trade secret, and proprietary information.

3.  Issue an order directing Defendants and any others acting in concert with them to provide an accounting of those to whom they have disclosed Rocket Pharma's confidential, trade secret, and proprietary information and to certify the steps they have taken to demand the return and destruction of documents and materials containing such information.

4.  Issue an order directing Lexeo to refrain from competing and working in the market for AAV gene and LVV cell therapy treatments targeting cardiac diseases.

5.  Award Rocket Pharma damages in an amount to be determined at trial, award all pre-judgment and post-judgment interest allowable by law, award Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and award any such other relief as the Court deems appropriate.

## COUNT III

### Breach of Contract
### (AS TO MR. LAW)

149.     Rocket Pharma incorporates and re-alleges each and every allegation above as if fully set forth herein.

150.     The October 13, 2016, Agreement created valid contractual obligations between Mr. Law and Rocket Pharma.

151.     Under the Law Agreement, Mr. Law was obligated to hold Rocket Pharma's proprietary information, including any and all confidential and/or proprietary knowledge, trade secrets, and know-how, in the strictest confidence and not directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information except as authorized by Rocket Pharma.

152.     Mr. Law agreed that his obligations under the Law Agreement would survive the termination of his employment, regardless of the reason.

153.     Under the Law Agreement, Mr. Law was prohibited from directly or indirectly engaging in any employment or business activity that was directly or indirectly competitive with, or that would otherwise conflict with, his employment by Rocket Pharma.

154.     Under the Law Agreement, Mr. Law was obligated to deliver to Rocket Pharma any and all property of Rocket Pharma's that was in his possession or control, provided to him by Rocket Pharma, or prepared by Mr. Law, including any material containing or disclosing any of Plaintiff's proprietary information, including trade secrets.

155.     Under the Law Agreement, Mr. Law was obligated to disclose to Rocket Pharma his new place of employment.

156.    Rocket Pharma has performed all of its obligations under the Law Agreement.

157.    Mr. Law has materially breached his obligations under the Law Agreement by downloading Rocket Pharma files containing highly confidential and proprietary trade secrets he learned through his work at Rocket Pharma and attempting to conceal the content of the downloads. Mr. Law has further materially breached his obligations by taking pictures of sensitive Rocket Pharma information.

158.    Upon information and belief, Mr. Law has also materially breached his obligations under the Law Agreement by accessing, using, and disclosing Rocket Pharma's proprietary information, including trade secrets, in his similar employment role at Lexeo, in competition with Rocket Pharma. Upon information and belief, he has wrongfully used and shared this information in collaborating with Lexeo on AAV research and development activities for the purpose of competing with Rocket Pharma. Moreover, Mr. Law has continued to solicit Rocket Pharma employees as recently as this year.

159.    Mr. Law has materially breached his obligations under the Law Agreement by failing to disclose he was leaving Rocket Pharma to work at Lexeo. Mr. Law refused to disclose this information in his exit interview despite being told he was contractually obligated to do so.

160.    Upon information and belief, Mr. Law's actions have at all times been knowing, willful, and malicious.

161.    As a result of Mr. Law's breaches of the Law Agreement, Mr. Law has directly harmed Rocket Pharma, thus damaging Rocket Pharma in an amount to be determined at trial.

162.    Rocket Pharma has no adequate remedy at law with respect to Mr. Law's material breaches of his obligations under the Law Agreement not to directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information.

163.    Rocket Pharma will be irreparably harmed absent an injunction against further breaches of Mr. Law's obligations under the Law Agreement not to directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information and an order requiring Mr. Law to return all documents and other materials containing Rocket Pharma's confidential and proprietary trade secret information, to provide an accounting of those to whom he has disclosed such information and destroy any other documents or materials reflecting such information, and to certify the steps he has taken to demand the return and destruction of such documents and materials.

WHEREFORE, Rocket Pharma respectfully requests that this Court:

1. Issue an order directing Mr. Law to refrain from accessing, disclosing, or using Rocket Pharma information and directing Mr. Law and any others acting in concert with him to return to Rocket Pharma all of Rocket Pharma's confidential, trade secret, and proprietary information in their possession, including any information derived from Rocket Pharma's misappropriated information.

2. Issue an order requiring Mr. Law to provide an accounting of those to whom he has disclosed Rocket Pharma's confidential, trade secret, and proprietary information and to certify the steps he has taken to demand the return and destruction of documents and materials containing such information.

3. Issue an order directing Mr. Law to refrain from competing and working in the market for AAV gene and LVV cell therapy treatments targeting cardiac diseases.

4. Award Rocket Pharma damages, including consequential damages, in an amount to be determined at trial, all pre-judgment and post-judgment interest allowable by law, and Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and any such other relief as the Court deems appropriate.

## COUNT IV

**Breach of Contract
(AS TO MS. GUTIERREZ)**

164.      Rocket Pharma repeats and re-alleges each and every allegation above as if fully set forth herein.

165.      The October 1, 2018, Agreement created valid contractual obligations between Ms. Gutierrez and Rocket Pharma.

166.      Under the Gutierrez Agreement, Ms. Gutierrez was obligated to hold Rocket Pharma's proprietary information, including any and all confidential and/or proprietary knowledge, trade secrets, and know-how, in the strictest confidence and not directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information except as authorized by Rocket Pharma.

167.      Under the Gutierrez Agreement, Ms. Gutierrez was obligated to disclose to Rocket Pharma her new place of employment.

168.      Ms. Gutierrez agreed that her obligations under the Gutierrez Agreement would survive the termination of her employment, regardless of the reason.

169.      Under the Gutierrez Agreement, Ms. Gutierrez was prohibited from directly or indirectly engaging in any employment or business activity that was directly or indirectly competitive with, or that would otherwise conflict with, her employment by Rocket Pharma.

170.      Under the Gutierrez Agreement, Ms. Gutierrez was obligated to deliver to Rocket Pharma any and all property of Rocket Pharma's that was in her possession or control, provided to her by Rocket Pharma, or prepared by Ms. Gutierrez, including any material containing or disclosing any of Plaintiff's proprietary information, including trade secrets.

171.      Ms. Gutierrez has materially breached her obligations under the Gutierrez

47

Agreement by failing to disclose she was leaving Rocket Pharma to work at Lexeo. Ms. Gutierrez refused to disclose this information in her exit interview despite being told she was contractually obligated to do so.

172.    Rocket Pharma has performed all of its obligations under the Gutierrez Agreement.

173.    Ms. Gutierrez has materially breached her obligations under the Gutierrez Agreement by sending various emails containing Rocket Pharma's confidential information, including confidential information relating to Rocket Pharma's AAV manufacturing process and AAV research, to her personal Gmail account.

174.    Upon information and belief, Ms. Gutierrez has also materially breached her obligations under the Gutierrez Agreement by accessing, using, and disclosing Rocket Pharma's proprietary information, including trade secrets, in her similar employment role at Lexeo, in competition with Rocket Pharma. Upon information and belief, she has wrongfully used and shared this information in collaborating with Lexeo on AAV research and development activities for the purpose of competing with Rocket Pharma.

175.    Upon information and belief, Ms. Gutierrez's actions have at all times been knowing, willful, and malicious.

176.    As a result of Ms. Gutierrez's breaches of the Gutierrez Agreement, Ms. Gutierrez has directly harmed Rocket Pharma, thus damaging Rocket Pharma in an amount to be determined at trial.

177.    Rocket Pharma has no adequate remedy at law with respect to Ms. Gutierrez's material breaches of her obligations under the Gutierrez Agreement not to directly or indirectly disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information.

178.    Rocket Pharma will be irreparably harmed absent an injunction against further breaches of Ms. Gutierrez's obligations under the Gutierrez Agreement not to directly or indirectly

disclose, use, lecture upon, or publish any of Rocket Pharma's proprietary information and an order requiring Ms. Gutierrez to return all documents and other materials containing Rocket Pharma's proprietary information, including trade secrets, and to provide an accounting of those to whom she has disclosed such information and destroy any other documents or materials reflecting such information, and to certify the steps she has taken to demand the return and destruction of such documents and materials.

WHEREFORE, Rocket Pharma respectfully requests that this Court:

1. Issue an order directing Ms. Gutierrez to refrain from accessing, disclosing, or using Rocket Pharma information and directing Ms. Gutierrez and any others acting in concert with her to return to Rocket Pharma all of Rocket Pharma's confidential, trade secret, and proprietary information in their possession, including any information derived from Rocket Pharma's misappropriated information.

2. Issue an order requiring Ms. Gutierrez to provide an accounting of those to whom she has disclosed Rocket Pharma's confidential, trade secret, and proprietary information and to certify the steps she has taken to demand the return and destruction of documents and materials containing such information.

3. Award Rocket Pharma damages, including consequential damages, in an amount to be determined at trial, all pre-judgment and post-judgment interest allowable by law, and Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and any such other relief as the Court deems appropriate.

## COUNT V

### Tortious Interference with Contractual Relations
### (AS TO LEXEO)

179.   Rocket Pharma incorporates and re-alleges each and every allegation above as if fully set forth herein.

180.   As discussed above, Rocket Pharma and its former employees, including both Mr. Law and Ms. Gutierrez, have entered into valid and binding contracts containing confidentiality and use restrictions prohibiting the disclosure of Rocket Pharma's confidential and proprietary trade secret information, as well as non-competition and non-solicitation restrictions.

181.   Rocket Pharma fulfilled all of its obligations pursuant to those Agreements.

182.   Lexeo had actual knowledge of those Agreements and the contractual obligations they imposed on Rocket Pharma's former employees, including Mr. Law and Ms. Gutierrez, to refrain from using or disclosing Rocket Pharma's confidential and proprietary information.

183.   Although Mr. Law and Ms. Gutierrez each agreed to be bound by the Agreements, Lexeo intentionally induced, and continues to intentionally induce, Mr. Law and Ms. Gutierrez to breach each of their contractual responsibilities by inducing them to disclose and use Rocket Pharma's technology and trade secrets for purposes expressly prohibited by those Agreements, including using them to facilitate and expedite Lexeo's development of directly competing products.

184.   Lexeo intentionally induced, and continues to intentionally induce, Mr. Law and Ms. Gutierrez to breach their contractual and fiduciary obligations to Rocket Pharma by inducing them to enter into Lexeo's employ in violation of the Agreements. Moreover, Rocket continues to solicit Rocket Pharma employees to enter into Lexeo's employ in violation of their contractual obligations.

185.     Lexeo's actions in inducing these breaches of contract were and are without justification, intentional, and illegal, and have been engaged in for the specific purpose of inducing Mr. Law and Ms. Gutierrez to breach their Agreements with Rocket Pharma.

186.     As a proximate result of Lexeo's tortious interference with contractual relations, Rocket Pharma has been damaged in an amount to be determined at trial.

WHEREFORE, Rocket Pharma respectfully requests judgment against Lexeo awarding Rocket Pharma damages in an amount to be determined at trial, all pre-judgment and post-judgment interest allowable by law, and Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and any such other relief as the Court deems appropriate.

## COUNT VII

### Unfair Competition
### (AS TO ALL DEFENDANTS)

187.     Rocket Pharma incorporates and re-alleges each and every allegation above as if fully set forth herein.

188.     Rocket Pharma has made significant investments in the development of confidential proprietary trade secrets relating to the development and manufacture of AAV gene and LVV cell therapies. These confidential and proprietary trade secrets are of substantial independent economic value and have conferred a competitive advantage on Rocket Pharma.

189.     Rocket Pharma has taken reasonable steps to maintain the secrecy of the trade secrets and utilizes non-solicitation/non-competition agreements with its employees, including Mr. Law and Ms. Gutierrez, to protect its investment in the development of its trade secrets.

190.     At all relevant times, Rocket Pharma has maintained a property right in its trade secrets. Mr. Law and Ms. Gutierrez had no rights in Rocket Pharma's trade secrets, and after leaving Rocket Pharma, had no rights to use Rocket Pharma's trade secrets. Lexeo had no rights in, or right to use, Rocket Pharma's trade secrets at any time.

191.     Rocket Pharma sent warning letters to both Mr. Law and Lexeo regarding the potential for misuse of Rocket Pharma's confidential and proprietary trade secret information, explaining that Mr. Law should not disclose or use that information in his new role at Lexeo and that Lexeo should refrain from putting Mr. Law in a position where he would use and/or disclose Rocket Pharma's confidential and proprietary trade secret information.

192.     To secure an unfair competitive advantage against Rocket Pharma, Lexeo falsely represented to Rocket Pharma that Mr. Law would not be working on any program similar to his

work at Rocket Pharma and, as such, there was no risk that Mr. Law would be using or disclosing Rocket Pharma's confidential and proprietary trade secret information.

193.    Mr. Law and Ms. Gutierrez have unfairly competed with Rocket Pharma and misappropriated Rocket Pharma's confidential and proprietary trade secret information by providing Lexeo with such materials, in breach of their common law and/or contractual duties to maintain the secrecy of these materials. Through these actions, Mr. Law and Ms. Gutierrez have misappropriated, disseminated, and disclosed Rocket Pharma's confidential and proprietary trade secret information to Rocket Pharma's direct competitors, such as Lexeo.

194.    Lexeo has induced former Rocket Pharma employees, including Mr. Law and Ms. Gutierrez, to disclose to it, in violation of their contractual and fiduciary obligations to Rocket Pharma, Rocket Pharma's confidential and proprietary trade secret information. Lexeo had actual knowledge of the contractual duties of Mr. Law, and, through reasonable, professional, and competent due diligence, Lexeo knew or should have known the employment histories of both Mr. Law and Ms. Gutierrez, and consequently their contractual duties to Rocket Pharma.

195.    Lexeo also has misappropriated Rocket Pharma's property (i.e., Rocket Pharma's confidential and proprietary trade secret information) to expedite its entry into clinical trials, and consequently the market, to enable it to compete with Lexeo in the gene therapy market, which Lexeo would otherwise have been unable to do.

196.    Defendants acted in bad faith in misappropriating Rocket Pharma's intellectual property as evidenced by, inter alia, Defendants continued use of Rocket Pharma's confidential and proprietary information after Rocket Pharma warned them of their misconduct, as well as the misconduct alleged throughout this Complaint. On information and belief, the actions of all Defendants have been at all times knowing, willful, and malicious.

197.    As a direct and proximate result of each Defendants' bad-faith misappropriation, Rocket Pharma has been damaged in an amount to be proven at trial.

198.    Rocket Pharma has no adequate remedy at law. Unless enjoined by this Court, Defendants' acts of unfair competition will continue, and Rocket Pharma will continue to suffer irreparable harm.

WHEREFORE, Rocket Pharma respectfully requests that this Court:

1. Issue an order directing Defendants and any others acting in concert with them to refrain from using, disclosing, or disseminating Rocket Pharma's confidential and proprietary trade secret information.

2. Issue an order directing Lexeo to refrain from competing and working in the market for AAV gene and LVV cell therapy treatments targeting cardiac diseases.

3. Issue an order directing Defendants and any others acting in concert with them to return to Rocket Pharma all of Rocket Pharma's confidential, trade secret, and proprietary information in their possession.

4. Issue an order directing Defendants and any others acting in concert with them to refrain from using, disclosing, or disseminating Rocket Pharma's confidential and proprietary trade secret information.

5. Award Rocket Pharma damages in an amount to be determined at trial, all pre-judgment and post-judgment interest allowable by law, and Plaintiff's attorneys' fees, costs, and disbursements incurred herein, and any such other relief as the Court deems appropriate.

## JURY DEMAND

Rocket Pharma requests trial by jury.


## PRAYER FOR RELIEF

Rocket Pharma incorporates the specific requested relief stated above for each count.

**WHEREFORE**, Rocket Pharma respectfully requests that the Court enter judgment in its favor and against Defendants on the claims set forth above, and respectfully requests that this Court:

1. Issue an order directing Defendants and any others acting in concert with them to return to Rocket Pharma all of Rocket Pharma's confidential and proprietary trade secret information, including any information derived from Rocket Pharma's misappropriated information.

2. Issue an order directing Defendants and any others acting in concert with them to refrain from accessing, using, disclosing, or disseminating Rocket Pharma's confidential and proprietary trade secret information, including any information derived from Rocket Pharma's misappropriated information.

3. Issue an order directing Defendants and any others acting in concert with them to provide an accounting of those to whom they have disclosed Rocket Pharma's confidential and proprietary trade secret information and to certify the steps they have taken to demand the return and destruction of documents and materials containing such information.

4. Issue an order directing Lexeo to refrain from competing and working in the market for AAV gene and LVV cell therapy treatments targeting cardiac diseases.

5. Award Rocket Pharma damages for misappropriation and exemplary damages for

willful misappropriation pursuant to 18 U.S.C. § 1836 et seq.

6.   Award Rocket Pharma its attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 et seq.

7.   Issue a preliminary and permanent injunction against Lexeo's PKP2 gene therapy program.

8.   Award Rocket Pharma damages in an amount to be determined at trial, award all pre-judgment and all post-judgment interest allowable by law, award Rocket Pharma's attorneys' fees, costs, and disbursements incurred herein, and award any such other relief as the Court deems appropriate.

Dated: October 12, 2023                    Respectfully submitted,


                                           /s Jakob B. Halpern
                                           Sean R. Kelly (skelly@saiber.com)
                                           Jakob B. Halpern (jhalpern@saiber.com)
                                           SAIBER LLC
                                           18 Columbia Turnpike, Suite 200
                                           Florham Park, NJ 07932
                                           (973) 622-8394

                                           *Of Counsel:*
                                           John M. Williamson (john.williamson@finnegan.com)
                                           Jennifer H. Roscetti (jennifer.roscetti@finnegan.com)
                                           Charles T. Collins-Chase (Charles.collins-chase@finnegan.com)
                                           Paul W. Townsend (paul.townsend@finnegan.com)
                                           Jordan M. Gringauz (Jordan.gringauz@finnegan.com)
                                           FINNEGAN, HENDERSON, FARABOW,
                                           GARRETT & DUNNER, LLP
                                           901 New York Avenue, NW
                                           Washington, DC 20001-4431
                                           (202) 408-4000

Candace C. Walther (candace.walther@finnegan.com)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363-6209
(404) 653-6400
*Attorneys for Plaintiff*