UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROCKET PHARMACEUTICALS, INC.,

                              Plaintiff,                              23-cv-9000 (PKC)

          -against-                                                  OPINION AND
                                                                     ORDER

LEXEO THERAPEUTICS, INC., KENNETH
LAW, and SONIA GUTIERREZ,

                              Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

   Rocket Pharmaceuticals, Inc. ("Rocket") brings this action against Lexeo

Therapeutics, Inc. ("Lexeo") and two employees that left Rocket to work at Lexeo: Kenneth Law

and Sonia Gutierrez (collectively, the "Individuals").  Rocket asserts trade secret

misappropriation claims against all defendants under the Defend Trade Secrets Act ("DTSA"),

18 U.S.C. § 1836(b)-(c) (Count I). It also asserts the following claims under New York law:

misappropriation of trade secrets against all defendants (Count II), breach of contract against the

Individuals (Counts III and IV), tortious interference with contractual relations against Lexeo

(Count V), and unfair competition against all defendants (Count VI[1]).

   Lexeo (ECF 56) and the Individuals (ECF 61) have moved to dismiss all claims

against them for failure to state a claim.  Rule 12(b)(6), Fed. R. Civ. P.  For reasons that will be

explained, the Court will deny the defendants' motions to dismiss, except as to the unfair

competition claim that the Court concludes is duplicative of other claims.

---

[1] The Complaint wrongly refers to this as Count VII, ECF 1, at 52, but the plaintiff asserts only six claims.

BACKGROUND

The Court accepts the allegations of the Complaint as true for the purposes of the motions and draws all reasonable inferences in favor of Rocket as the non-movant.  Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).  The Court also considers Law's employment agreement with Rocket (ECF 62-1), Gutierrez's employment agreement with Rocket (ECF 62-2), Rocket's January 6, 2022 letter to Lexeo (ECF 67-2), and Lexeo's February 17, 2022 letter to Rocket in response (ECF 57-1) as documents incorporated by reference into Rocket's complaint.  See Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).

Rocket and Lexeo are both biotechnology companies.  (Complaint ¶¶ 2, 105.) Rocket develops cell and gene therapies using either the adeno-associated virus ("AAV") or the lentiviral vector ("LVV") platform.  (Id. ¶ 4.)  Rocket develops its gene therapies in multiple stages.  (Id. ¶ 5.)  It begins with gene chemistry research and then establishes a reliable way to manufacture the gene therapy.  (Id.)  Then, it begins testing the efficacy of its therapy; it begins with preclinical studies and ends with Phase III clinical trials in human patients.  (Id.)  Lexeo develops gene therapies using only the AAV platform.  (Id. ¶ 105.)  Both companies are developing a treatment for arrhythmogenic cardiomyopathy due to mutations in the PKP-2 gene ("PKP-2 arrhythmogenic cardiomyopathy") using the AAV platform.  (Id. ¶ 11.)

Kenneth Law began working as a scientist at Rocket in October 2016, and Sonia Gutierrez began working there in October 2018.  (Id. ¶¶ 75, 84.)  In their employment agreements with Rocket, both Individuals agreed to maintain the confidentiality of Rocket's confidential and proprietary information.  (Id. ¶¶ 83-84.)  Law and Gutierrez also agreed that, while employed at Rocket and for twelve and six months, respectively, after their employment

with Rocket ended, they would not "engage in any business activities that are competitive with the products or services" offered by Rocket and would inform Rocket if they engaged in such a business venture.  (Id.; ECF 62-1 ¶¶ 6, 12.2; ECF 62-2 ¶¶ 6, 14.2.)

Law worked on Rocket's gene therapy manufacturing processes in Rocket's Chemistry Manufacturing and Controls  ("CMC") group.  (Id. ¶¶ 75-77.)  He eventually became the Associate Director of CMC and Analytical Development.  (Id. ¶ 77.)   His responsibilities included overseeing the "design, development, and qualification of analytical methods to assess product identity, purity, quality and potency for the company's portfolio of preclinical and clinical-stage programs" and supporting the chemistry manufacturing and product development teams.  (Id. ¶ 77.)  Through his role, Law had access to all aspects of Rocket's chemistry manufacturing, analytics, supply chain, and clinical trial information for both the AAV and LVV programs.  (Id. ¶ 78.)  Gutierrez joined Rocket as a "Scientist" and was eventually promoted to "Senior Scientist."  (Id. ¶¶ 79-80.)  She developed AAV analytics, assisted in the drafting of Investigational New Drug applications to the U.S. Food and Drug Administration ("FDA"), and "supported the expansion of the capabilities of the R&D lab to do reliable analytics in-house." (Id.)

While he was still employed with Rocket, Law interviewed with Lexeo and received a letter from Lexeo formally offering him employment. (Id. ¶ 13.)   Before leaving Rocket, Law transferred 122,987 Rocket emails and documents from his Rocket work computer to his personal computer.  (Id. ¶ 94.)  Many of the documents were marked "CONFIDENTIAL." (Id.)  The emails contained, for example, clinical trial study designs, patient data, and information about Rocket's drug manufacturing process.  (Id. ¶ 95.)  He also downloaded additional files from his Rocket computer onto two USB drives and used an application called

TimeMachine to back up his entire Rocket work computer to an external hard drive.  (Id. ¶ 96.) He downloaded the applications "AppCleaner" and "Nektony App Cleaner" to his Rocket computer to delete traces of the applications he used to remove these documents.  (Id. ¶ 97.)  He also took photographs of Rocket's laboratories using his work phone that captured lab protocols on another employee's notebook, cell culture techniques, and cell data related to the development of AAV and LVV gene therapies.  (Id. ¶ 16.)  In his exit interview with Rocket, he did not inform the company that he was leaving to work for Lexeo.  (Id. ¶ 19.)

Gutierrez also accepted a position at Lexeo while she was still working at Rocket. Three weeks before she left Rocket, Gutierrez forwarded an e-mail to her personal e-mail account from her former supervisor that included a link that he stated contained "[e]very file I have ever generated at Rocket."  (Id. ¶ 17.)  The link contained a substantial amount of Rocket's confidential and proprietary manufacturing documents.  (Id.)  In her exit interview, she did not tell Rocket that she was leaving to work at Lexeo.  (Id. ¶ 19.)

In December 2021, Rocket learned that Law had begun working at Lexeo.  (Id. ¶ 20.)  Rocket wrote a letter to Lexeo stating Law was required to inform Rocket of his employment with Lexeo but did not do so.  (ECF 67-2, at 2.)  Additionally, Rocket informed Lexeo that Law "filled a key role" at Rocket and "came to learn confidential, proprietary, and trade secret information" about Rocket and its business.  (Id.)  Rocket stated that it expected that Lexeo "will not encourage Mr. Law to disclose or use the Company's Confidential Information" and "refrain from putting Mr. Law in a position where it would be inevitable that he would disclose the Company's Confidential Information."  (Id.)  Rocket also informed Lexeo that Law's employment agreement with Rocket included a non-compete provision.  (Id.)

In response, Lexeo wrote to Rocket that it "had no interest in or intent to use any proprietary information of Rocket.  In fact, prior to the commencement of Mr. Law's employment with LEXEO, Mr. Law was informed in writing that LEXEO did not desire to acquire from him any trade secrets, know how or confidential business information that he might have received from a third party, such as Rocket."  (ECF 57-1, at 2.)  Lexeo confirmed that "Mr. Law has been instructed by LEXEO, and has agreed, not to improperly use or disclose to LEXEO any confidential, proprietary or trade secret information of Rocket" and that "prior to commencing employment with LEXEO, Mr. Law was instructed that he was not permitted to bring any confidential, proprietary or trade secret information of Rocket on to LEXEO's premises."  (Id.)  At a May 2023 conference for AAV research in the cardiac field, Rocket scientists observed a poster publicizing a Lexeo paper about the merits of the AAVrh.10 gene therapy vector opposed to AAV9 gene therapy vector in which Law and Gutierrez were two of thirteen authors.  (ECF 53-3, at 2.)

On September 29, 2023, Lexeo filed a Form S-1 Registration Statement with the Securities and Exchange Commission to commence an initial public offering.  (Complaint ¶ 113.)  In this filing, Lexeo stated that it received Investigative New Drug clearance from the FDA for its PKP-2 arrhythmogenic cardiomyopathy treatment in July 2023.  (Id.)

DISCUSSION

I.    Legal Standard on a Rule 12(b)(6) Motion

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corporation v.

Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  Id.

When assessing a complaint, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).  The Court is not bound to accept "legal conclusion[s] couched as [] factual allegation[s]" as true.  Drimal v. Tai, 786 F.3d 219, 223 (2d Cir. 2015) (internal quotation omitted).  The Court examines only the well-pleaded factual allegations "and then determine[s] whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.

## II.    The Federal and New York Trade Secret Misappropriation Claims

To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege that it (1) possessed a trade secret that (2) the defendant misappropriated.  18 U.S.C. § 1836(b)(1).  Under New York law, a plaintiff claiming misappropriation of a trade secret must allege "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  E.J. Brooks Company v. Cambridge Security Seals, 31 N.Y.3d 441, 453 (2018).  "The elements for a trade misappropriation claim under [the DTSA and] New York law are fundamentally the same."  Iacovacci v. Brevet Holdings, LLC, 437 F.Supp.3d 367, 380 (S.D.N.Y. 2020).  For that reason, "courts have found that a complaint sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law."  Id. (internal quotations and alterations omitted).  Accordingly, the Court will analyze Rocket's claim under the DTSA and New York

law together.  See Syntel Sterling Best Shores Mauritius Limited v. The TriZetto Group, Inc., 68 F.4th 792, 800 (2d Cir. 2023).

The DTSA defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

New York law does not have a "generally accepted definition of a trade secret," but the definition in the Restatement of Torts "has been cited with approval" by New York's highest court.  Ashland Management Inc. v. Janien, 82 N.Y.2d 395, 407 (1993).  The Restatement defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Id.  New York courts consider: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be acquired or duplicated by others.  Id.  As these factors demonstrate, "a trade secret must first of all be secret" under New York law.  Id.

A.  Rocket Has Plausibly Alleged That It Possessed Trade Secrets

The DTSA and New York trade secret misappropriation claims are governed by the notice pleading standard of Rule 8(a), Fed. R. Civ. P.  The plaintiff must identify a purported

trade secrets with sufficient specificity to place a defendant on notice of the bases for the claims against it and for a court to assess whether a trade secret has been plausibly alleged.  See Syntel Sterling Best Shores Mauritius Limited, 68 F.4th at 800-01.  The Second Circuit "has not squarely articulated the precise contours of the specificity requirement in the context of trade secrets."  Id. at 801 n.9.  Some district courts in this Circuit have accepted relatively general descriptions of the alleged trade secret at the motion to dismiss stage, such as "technical data, internal pricing information, work product, research, [and] engineering design."  Lavvan, Inc. v. Amyris, Inc., 20 Civ. 7386 (JPO), 2021 WL 3173054, at *4 (S.D.N.Y. July 26, 2021) (collecting authorities) (internal quotations omitted).  Others have concluded that merely pleading a general category of confidential information without providing details to define the specific trade secret at issue is insufficient.  Id.

The Complaint identifies the purported trade secrets with sufficient specificity to inform the defendants of the information they are alleged to have misappropriated and to allow the Court to determine whether the information is plausibly a trade secret.  Rocket identifies specific categories of information relating to Rocket's production and creation of AAV and LLV treatments, including "cell line production methods and data, cell culturing conditions, formulation, purification protocols, potency assays, harvesting methods and protocols, expected yields and quality testing and sampling techniques for the AAVs and LVVs."  (Complaint ¶ 58.1.)  It also identifies categories of trade secrets related to Rocket's AAV optimization research, such as "comparison assays, experimental data, serotype selection experiments, optimized genomes for viral vectors, plasmid ratios and concentrations, plasmid design, experimental know-how, and business information."  (Id. ¶ 63.)  The Complaint also sets forth categories of trade secrets related to Rocket's investigational AAV gene therapy target

information, including "AAV modifications, preclinical experimental design, clinical trial design, animal model data, patient data, patient protocols, patient identification data, a list of clinical trial collaborators and partners, clinical trial contacts, dosage and formulation information, drug storage and preparation protocols, drug administration protocols, sample processing logs, shipping procedures, patient data, chain of custody forms, potency assays, and pricing and contact information of collaborators."  (Id. ¶ 67.)

Additionally, the Complaint identifies specific documents Law took from Rocket and the trade secrets those documents contained.  First, it identifies an email communication detailing Rocket's "titration experiments, noting the differences between [Rocket's] protocol and the standard protocol used in the field" that included "an attachment with AAV genome titration experimental data conducted in-house."  (Id. ¶ 60.)  Second, it identifies a document detailing "aspects of Rocket Pharma's upstream and downstream manufacturing processes, noting the steps of the cell culturing processes and how long it takes Rocket Pharma to complete each step. The document also contained confidential dosing-related information."  (Id. ¶ 61.)  Third, it identifies a document containing "data from a third-party collaborator that ran an analysis experiment on one of Rocket Pharma's plasmids used in an AAV gene therapy treatment.  The document discloses the plasmid design and modifications along with formulation information." (Id. ¶ 64.)  Fourth, it identifies a document detailing Rocket's "Standard Operating Procedure for dose calculation, distribution, and infusion preparation instructions for AAV gene therapies." (Id. ¶ 70.)

These alleged trade secrets are not "nebulous" or "vague" categories of information that fail to inform the defendants or the Court of the trade secrets the defendants allegedly misappropriated.  Rocket is not obligated to plead its trade secrets with such specificity

that it "reveal[s] its secrets in the complaint simply to prove that they exist." Catalyst Advisors, L.P. v. Catalyst Advisors Investors Global Inc., 602 F.Supp.3d 663, 672 (S.D.N.Y. 2022) (internal quotations and alterations omitted). At the pleadings stage, Rocket has sufficiently identified the trade secrets purportedly misappropriated by the defendants.

   To succeed on its trade secrets claims, Rocket must also plausibly allege it took "reasonable measures" to keep its trade secrets secret. Mason v. Amtrust Financial Services, 848 F. App'x. 447, 450 (2d Cir. 2021) (summary order). While "absolute secrecy is not required, a trade secret must be veiled in sufficient secrecy that except by use of improper means, there would be difficulty in acquiring the information." Town & Country Linen Corp. v. Ingenious Designs LLC, 556 F.Supp.3d 222, 258 (S.D.N.Y. 2021) (internal quotation and alterations omitted). The Second Circuit has explained that "given that trade secrets may appear in a wide variety of forms and types, what measures are reasonable must depend in significant part on the nature of the trade secret at issue." Turret Labs USA, Inc. v. CargoSprint, LLC, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (summary order) (internal citation and quotation omitted). For that reason, whether a protective measure was "reasonable" is a case-specific inquiry. Better Holdco, Inc., 666 F.Supp.3d at 385; see also Niemi v. NHK Spring Co., 543 F.3d 294, 301 (6th Cir. 2008). "Generally speaking, such [protective] measures can include the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." Catalyst Advisors, L.P., 602 F.Supp.3d at 675 (internal quotation omitted).

   The Complaint alleges that Rocket requires all employees "to sign an agreement with non-disclosure and restricted use obligations, requiring all executing parties to maintain the

confidentiality of Rocket Pharma's proprietary information." (Complaint ¶ 72.)  These agreements also required all employees leaving Rocket to inform the company of their new employer.  (Id.)  Additionally, Rocket alleges that that it discloses proprietary information to employees on a need-to-know basis.  (Id. ¶ 73.)  Rocket restricts access to physical files containing proprietary information and limited access to virtual SharePoint folders containing proprietary information.  (Id.)  Rocket alleges it also limits access to physical locations in its research and development facility through key fobs that grant access to different areas of the facility.  (Id.)  It also employs security professionals and video surveillance systems to monitor its facilities.  (Id.)  When Rocket discloses propriety information to third parties, it requires them to sign confidential disclosure agreements obligating them to maintain the confidentiality of any proprietary information they received.  (Id. ¶ 74.)   At the motion to dismiss stage, the Complaint plausibly alleges that Rocket took reasonable measures to protect its trade secrets.

> B.  Rocket Has Plausibly Alleged That The Defendants Misappropriated Rocket's Trade Secrets

The DTSA defines "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who," inter alia, "used improper means to acquire knowledge of the trade secret [or] at the time of disclosure or use, knew or had reason to know that the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5).  The term "improper means" is defined to "include[] theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6).

The DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." AUA Private Equity Partners, LLC v. Soto, No. 17 Civ. 8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018).

The Complaint plausibly alleges that Law misappropriated Rocket's trade secrets under the "acquisition" and the "use" theories of liability.  Before leaving Rocket, Law acquired the alleged trade secrets by downloading them to his personal computer.  (Complaint ¶ 14.)  Law knew or had reason to know that he obtained the trade secrets through improper means by downloading them to his personal computer before he left Rocket's employee and maintaining possession of the personal computer with the trade secrets post-employment by Rocket.  The Complaint plausibly alleges that  documents were Rocket's property that Law obtained  by misappropriation.  The Complaint  plausibly alleges intentional conduct and consciousness of guilt on the part of Law in that, in order to prevent detection of his misappropriation, Law downloaded the applications AppCleaner and Nektony App Cleaner to uninstall the applications he used to download these emails and documents.  (Id. ¶ 97).

With respect to Lexeo, the Court concludes that the Complaint plausibly alleges that it misappropriated Rocket's trade secrets.  "At the pleading stage, courts may reasonably infer that the defendant used plaintiff's trade secret where the defendant retains plaintiff's employees and launches a competing product shortly thereafter."  Data Device Corp. v. W.G. Holt, Inc.. No. 19-cv-4105(JS)(ARL), 2020 WL 7024312, at *5 (E.D.N.Y. Nov. 30, 2020) (collecting authorities).  At the pleading stage , certain of the Complaint's factual allegations are circumstantial but in totality plausibly allege a claim against Lexeo.  Lexeo recruited Law and Gutierrez from Rocket.  Both Law and Gutierrez misappropriated large quantities of Rocket's confidential information before leaving.  As for Law, the Court has already concluded that the

Complaint plausibly alleges that the information he downloaded included Rocket's trade secrets. Law and Gutierrez performed similar roles at Lexeo as they had at Rocket—managing the manufacturing process for AAV treatments in the cardiac space, including Lexeo's PKP-2 treatment. (Id. ¶¶ 24, 108-109.) When Law left Rocket and joined Lexeo, Rocket's PKP-2 arrhythmogenic cardiomyopathy treatment was further developed than Lexeo's. (Id. ¶¶ 107, 112.) In July 2023, Lexeo announced that it had obtained Investigative New Drug clearance from the FDA for its PKP-2 treatment. (Id. ¶ 113.) Lexeo obtained this FDA clearance "just weeks" after Rocket obtained the same clearance for its competing PKP-2 treatment. (Id. ¶ 28.)

At the motion to dismiss stage, Rocket must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence" of Lexeo's liability. Twombly, 500 U.S. at 556. Law's possession of Rocket's trade secrets while employed at Lexeo in a position where those trade secrets would be useful combined with the timeline of Lexeo's development of its PKP-2 treatment raise a reasonable expectation that discovery will reveal that Law used the trade secrets in the course of his employment with Lexeo. Oakwood Laboratories LLC v. Thanoo, 999 F.3d 892, 911 (3d Cir. 2021) (the allegation that a drug could not have been developed in a certain timeframe without the use of the plaintiff's trade secrets is entitled to the assumption of truth at the pleadings stage). Any use of Rocket's trade secrets on Lexeo's behalf by Law constitutes "use" of the trade secrets by Lexeo as well as an independent basis for Law's individual liability under the DTSA. See Better Holdco, Inc., 666 F.Supp.3d at 390 (defendant company "used" plaintiff's trade secrets when the defendant's employee used plaintiff's trade secret). Law's usage of Rocket's trade secrets on Lexeo's behalf constitutes "improper means," because his usage breached his duty to Rocket to maintain the secrecy of its trade secrets. Law's employment agreement with Rocket prevented him from using Rocket's confidential and

proprietary information, including its trade secrets, without Rocket's permission.  (ECF 62-1
¶ 1.1.).  Additionally, "[the Second Circuit] and numerous New York courts have held that an
agent has a duty not to use confidential knowledge acquired in his employment in competition
with his principal" that exists after the agent's employment has been terminated.  <u>North Atlantic
Instruments, Inc. v. Haber</u>, 188 F.3d 38, 47 (2d Cir. 1999).  Law's use of Rocket's trade secrets
in competition with Rocket also violated this implied duty. The Complaint plausibly alleges a
DTSC and New York trade secret misappropriation claims against Lexeo.

        The Complaint's allegations of  misappropriation of Rocket's trade secrets by
defendant Gutierrez are thin but sufficient to plausibly allege a claim.  Rocket alleges that three
weeks before leaving Rocket, Gutierrez forwarded an email to her personal email account from
her former supervisor that included a link he described as containing "[e]very file I have ever
generated at Rocket."  (<u>Id</u>. ¶ 17.)  Rocket asserts that the link contained substantial amounts of
Rocket's "confidential and proprietary manufacturing documents." (<u>Id</u>.)  The Complaint
plausibly alleges that Gutierrez acted in concert with Law.  Law was an Associate Director of
CMC and Analytical Development at Rocket Pharma, and Gutierrez was a Senior Scientist at
Rocket Pharma supporting the CMC group. (<u>Id</u>. at ¶ 13.)  "Mr. Law and Ms. Gutierrez not only
worked together at Rocket Pharma but also compounded their knowledge of Rocket Pharma's
confidential, proprietary, and trade secret information."  (Id. at ¶ 18.)  Neither Law nor Gutierrez
revealed that they were going to work at Lexeo despite a contractual obligation to do so.  (<u>Id</u>. at
¶ 19.).  Lexeo placed Law and Gutierrez in analogous roles to aid Lexeo in manufacturing AAV
gene therapies.  (<u>Id</u>. at ¶ 24.) In their roles at Rocket, Law and Gutierrez had access to Rocket's
"confidential, proprietary, and trade secret information related to studying AAV serotypes and
developing AAV products that have enhanced tropism, favorable vector biodistribution, and high

transgene expression for heart tissue, including AAV9 vectors."  (<u>Id</u>. at ¶ 25.)  Lexeo then

displayed a poster at a conference on AAV in the cardiac field identifying Law and Gutierrez as

co-authors of work for Lexeo in "studying AAV serotypes and products which have enhanced

tropism, favorable vector biodistribution, and high transgene expression for heart tissue,

including AAV9 and AAVrh10 vectors." (<u>Id</u>.)  The Complaint strongly suggests that Law and

Gutierrez left Rocket at about the same time to join Lexeo (<u>Id</u>. ¶¶ 13-17,70), a point that is

outright conceded in the memorandum of law of Law and Gutierrez.  (ECF 63, at 7.)  Taken as a

whole, the Complaint plausibly alleges Gutierrez worked with Law in the misappropriation of

Rocket's trade secrets before leaving Lexeo, and once at Lexeo, she worked with Law in the

continuing use of Rocket's trade secrets.  Of course, the case against Gutierrez may look very

different at the summary judgment or trial stages.

    III.      <u>The Breach of Contract Claims</u>

        To state a claim for breach of contract under New York law, Rocket must

plausibly allege "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3)

defendant breached its contractual obligations; and (4) defendant's breach resulted in damages."

<u>34-06, LLC v. Seneca Insurance Co.</u>, 39 N.Y.3d 44, 52 (2022) (internal citations omitted).  The

individuals do not dispute that Rocket has adequately alleged that an employment contract

existed between Rocket and Law and between Rocket and Gutierrez or that Rocket complied

with all material terms of the employment contracts.

        Rocket has plausibly alleged that Law and Gutierrez both breached various

provisions in their employment contracts.  First, both Law and Gutierrez agreed that, during their

employment with Rocket and for twelve and six months, respectively, after that employment

ended, neither would engage in business activities that were competitive with Rocket's.  (ECF 62-1, at ¶ 6; ECF 62-2, at ¶ 6.)  Both Law and Gutierrez began employment during this time period with Lexeo, a direct competitor of Rocket's.  Second, both agreed to hold Rocket's confidential information, including trade secrets, "in strictest confidence" and not to disclose, use, lecture upon, or publish any such information without Rocket's authorization.  (ECF 62-1, at ¶ 1.1; ECF 62-2, at ¶ 1.1.)  The Complaint plausibly alleges that Law breached this provision by downloading Rocket's documents to his personal computer and using the trade secrets contained therein during his employment with Lexeo.  As for Gutierrez, the Complaint plausibly alleges that she breached this provision by forwarding to her personal email a link containing Rocket's confidential information.  Third, both agreed to inform Rocket of their new employer.  (ECF 62-1, at ¶ 12.2; ECF 62-2 at ¶ 14.2.)  Neither did so.

The Complaint has also plausibly alleged that Law's and Gutierrez's breaches of their employment contracts resulted in damages to Rocket.  At the motion to dismiss stage, Rocket need only plead allegations from which damages attributable to the defendant's breach might be reasonably inferred.  St. Christopher's, Inc. v. JMF Acquisitions, LLC, No. 20-2308, 2021 WL 6122674, at *4 (2d Cir. Dec. 28, 2021) (summary order) (applying New York law). The damages a plaintiff alleges "must be not merely speculative, possible, and imaginary, but they must be *reasonably certain* and such only as actually follow or may follow from the breach of the contract."  Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 110 (2d Cir. 2007) (applying New York law) (emphasis in original).  However, "[c]ertainty, as it pertains to general damages, refers to the *fact* of damage, not the amount."  Id. (emphasis in original & internal quotations omitted).

16

The Court can reasonably infer that the breaches of Law's and Gutierrez's employment agreements damaged Rocket.  The Complaint alleges that Rocket has invested many years and millions of dollars in developing its gene therapy programs, including tens of millions of dollars in research and development of its PKP-2 treatment.  (Id. ¶¶ 7, 9.)  When Law and Gutierrez allegedly retained Rocket's confidential information and disclosed it to one of Rocket's competitors, the competitive position of Rocket's business was damaged.  It is immensely valuable to be the first developer of a drug treatment, and Lexeo allegedly "close[d] the gap" in the development of its PKP-2 treatment due to this information.  This alone is sufficient to plausibly allege that Rocket suffered damages due to the breaches of the individuals' employment agreements.

IV.     The Tortious Interference With Contractual Relations Claim

Under New York law, tortious interference with contractual relations "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."  Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).  Rocket alleges that Lexeo had actual knowledge of Law's and Gutierrez's employment agreements with Rocket but intentionally induced these individuals to breach these agreements by offering them positions at Lexeo wherein they would use Rocket's confidential information.

There is no dispute that a valid contract existed between Law and Rocket and Gutierrez and Rocket, and there is no dispute that Lexeo knew of these contracts.  For the reasons already discussed, Law and Gutierrez each breached their employment agreement, and

Rocket suffered damages due to these breaches.  Lexeo moves to dismiss the tortious

interference with contractual relations claim on the ground that it did not "intentionally procure"

the breaches of the individuals' employment agreements.  With respect to the "intentional

procurement" element of the tort of interference with contractual relations, the plaintiff "must

allege that there would not have been a breach but for the activities of [the] defendant[]."

Sharma v. Skaarup Ship Management Corp., 916 F.2d 820, 828 (2d Cir. 1990) (internal

quotation omitted).  In applying this test, "[t]he proper question is whether, in the absence of

interference by [Lexeo], the breach would have occurred."  Rich v. Fox News Network, LLC,

939 F.3d 112, 127 (2d Cir. 2019).  A defendant intentionally procures a breach when he "knows

of a valid employment contract for professional services, [and] commits an intentional act whose

probable and foreseeable outcome is that one party will breach the contract, causing the other

party damage."  Leventhal v. Franzus Co., No. 88 Civ. 3547 (MBM), 1988 WL 132868, at *7

(S.D.N.Y. Dec. 6, 1988) (summarizing the holding in Campbell v. Gates, 236 N.Y. 457 (1923)).

       The Court readily concludes that Lexeo intentionally procured the breaches of the

individuals' employment agreements.  The Complaint plausibly alleges that Lexeo knew or

should have known that both Law and Gutierrez had valid employment agreements with Rocket

that included non-compete provisions and provisions governing the use of Rocket's confidential

information.  The necessary consequence of Lexeo's employment of Law and Gutierrez was that

they would breach the non-compete provisions in their employment agreements.  Separately, if

Lexeo had not offered Law and Gutierrez employment, neither of them would have breached the

provisions in their employment agreement governing the use of Rocket's confidential

information.  The Complaint alleges that Law and Gutierrez downloaded and otherwise

improperly obtained Rocket's confidential information only after they had been offered

employment at Lexeo, because they expected that the information would be useful to them in their new employment at Lexeo.  Rocket has thus plausibly alleged that Lexeo intentionally procured the breaches of the individual's employment agreements, and the Complaint states a claim a tortious interference claim against Lexeo.

V.    The Unfair Competition Claim

New York courts recognize two theories of common-law unfair competition claims: (1) "palming off" and (2) misappropriation.  ITC Ltd. V. Punchgini, Inc., 9 N.Y.3d 467, 476 (2007).  "Palming off," not applicable here, concerns the sale of goods of one manufacturer as those of another.  Id.  Under the misappropriation theory, a party is liable if they unfairly exploit "the skill, expenditures and labors" of a competitor.  E.J. Brooks Co. v. Cambridge Security Seals, 31 N.Y.3d 441, 449 (2018).  "The essence of the misappropriation theory is not just that the defendant has reap[ed] where it has not sown, but that it has done so in an unethical way and thereby neutralized a commercial advantage that the plaintiff achieved through honest labor."  Id. (internal quotations and alterations omitted).  However, "[i]t is well established that a claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action and should be dismissed as duplicative."  TileBar v. Glazzio Tiles, 22-cv-3823, 2024 WL 1186567, at *19 (E.D.N.Y. Mar. 15, 2024) (internal quotation and alteration omitted) (collecting authorities).  So too "[w]here a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim must be dismissed as duplicative of the breach claim."  Hedgeye Risk Management, LLC v. Dale, No. 21-cv-3687, 2023 WL 6386845, at *16 (S.D.N.Y. Sept. 29, 2023) (internal quotation omitted).

Rocket's unfair competition claim will be dismissed as duplicative of the breach of contract claims against the Individuals and the tortious interference claim against Lexeo. The Complaint alleges that Law and Gutierrez "have unfairly competed with Rocket Pharma and misappropriated Rocket Pharma's confidential and proprietary trade secret information by providing Lexeo with such materials." (Complaint ¶ 193.) Lexeo allegedly induced Law and Gutierrez to disclose Rocket's trade secrets to it and misappropriated this information to expedite its entry into clinical trials and compete with Rocket in the gene therapy market. (Id. ¶ 194.) These same facts form the basis for Rocket's trade secret misappropriation claims, which also stem from the acquisition of Rocket's confidential information by Law and Gutierrez and Lexeo's subsequent usage of this information to accelerate the development of its gene therapies. To the extent that the unfair competition claim is premised upon the retention and use of Rocket's information that is confidential but not a trade secret, it is duplicative of the breach of contract claims against the Individuals and the tortious interference with contractual relations claim against Lexeo. Since Rocket does not allege any acts of unfair competition separate from the acts forming the basis of its other claims, Rocket's unfair competition claim will be dismissed as duplicative.

CONCLUSION

Lexeo's motion to dismiss (ECF 55) is GRANTED IN PART and DENIED IN PART. The Individuals' motion to dismiss (ECF 61) is GRANTED IN PART and DENIED IN PART. The unfair competition claim (Count VI but denoted as Count VII in the Complaint) is dismissed as to all defendants. The Clerk of Court is respectfully requested to terminate docket entries 55 and 61.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        August 14, 2024