```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/17/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rocket Pharmaceuticals, Inc.,

                  Plaintiffs,

-against-

Lexeo Therapeutics, Inc., et al.,

                  Defendants.

1:23-cv-09000 (PKC) (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

    Plaintiff Rocket Pharmaceuticals, Inc. ("Plaintiff" or "Rocket") filed this action against Defendant Lexeo Therapeutics, Inc. ("Lexeo") and two employees who left Rocket to work at Lexeo, *i.e.*, Kenneth Law and Sonia Gutierrez (together, the "Individuals," and collectively with Lexeo, the "Defendants") asserting trade secret misappropriation claims against the Defendants under the Defend Trade Secrets Act, as well as claims under New York law for misappropriation of trade secrets against the Defendants, for breach of contract against the Individuals and for tortious interference with contractual relations against Lexeo. *See Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, No. 23-CV-09000 (PKC), 2024 WL 3835264, at *1 (S.D.N.Y. Aug. 14, 2024).[1] Pending before the Court[2] is a Letter Motion by Plaintiff seeking (1) disqualification of Dr. Richard

---

[1] Plaintiff also had brought an unfair competition claim against the Defendants, but that claim was dismissed by the Court. *See Rocket Pharms.*, 2024 WL 3835264, at *1.

[2] On December 4, 2024, Judge Castel referred this case to the undersigned for general pretrial supervision, including non-dispositive pretrial motions. (Order of Reference, ECF No. 116.) The undersigned is issuing this Opinion and Order pursuant to that referral. *See Rouviere v. DePuy Orthopaedics, Inc.*, 496 F. Supp. 3d 811, 813 (S.D.N.Y. 2020) (citing *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, No. 98-CV-0082A (JF), 2005 WL 1074320, at *1 n.1 (W.D.N.Y. Feb. 9, 2005) ("A motion to disqualify a prospective testifying expert is non-dispositive in nature and subject to review as clearly erroneous or contrary to law."), *objections overruled*, 367 F. Supp. 2d 413 (W.D.N.Y. 2005)).

Peluso from acting as a potential expert for Lexeo in this matter or, in the alternative, (2) an Order precluding Lexeo from disclosing Rocket confidential information to Dr. Peluso. (Pl.'s 11/25/24 Ltr. Mot., ECF No. 104/105.[3]) For the reasons set forth below, Plaintiff's Letter Motion is GRANTED and Dr. Peluso is disqualified from acting as an expert for Lexeo in this matter.

## BACKGROUND

### I.    Complaint Allegations[4]

Rocket and Lexeo are both biotechnology companies. Rocket develops cell and gene therapies using either the adeno-associated virus ("AAV") or the lentiviral vector ("LVV") platform. Rocket develops its gene therapies in multiple stages. It begins with gene chemistry research and then establishes a reliable way to manufacture the gene therapy. Then, it begins testing the efficacy of its therapy; it begins with preclinical studies and ends with Phase III clinical trials in human patients. Lexeo develops gene therapies using only the AAV platform. Both companies are developing a treatment for arrhythmogenic cardiomyopathy ("ACM")[5] due to mutations in the PKP-2 gene ("PKP-2 ACM") using the AAV platform.

Kenneth Law ("Law") began working as a scientist at Rocket in October 2016, and Sonia Gutierrez ("Gutierrez") began working there in October 2018. In their employment agreements with Rocket, both Individuals agreed to maintain the confidentiality of Rocket's confidential and

---

[3] Plaintiff's Letter Motion was filed under seal at ECF No. 104. A redacted version is publicly filed at ECF No. 105.

[4] The following section is derived from District Judge Castel's Opinion and Order deciding Defendants' motion to dismiss, with citations to the Complaint and to other parts of the ECF record, as well as certain internal quotation marks omitted and a footnote added. *See Rocket Pharms.*, 2024 WL 3835264, at *1-33.

[5] ACM is a condition in the myocardium, the heart's muscular wall, where a defect in proteins that connect heart muscle cells causes the cells to die and be replaced by scar tissue and fatty cells. *Arrhythmogenic Cardiomyopathy (ACM)*, Univ. of Penn. Medicine (2024), available at https://perma.cc/B9GJ-2FQZ.

proprietary information. Law and Gutierrez also agreed that, while employed at Rocket and for twelve and six months, respectively, after their employment with Rocket ended, they would not engage in any business activities that are competitive with the products or services offered by Rocket and would inform Rocket if they engaged in such a business venture.

Law worked on Rocket's gene therapy manufacturing processes in Rocket's Chemistry Manufacturing and Controls ("CMC") group. He eventually became the Associate Director of CMC and Analytical Development. His responsibilities included overseeing the design, development, and qualification of analytical methods to assess product identity, purity, quality and potency for the company's portfolio of preclinical and clinical-stage programs and supporting the chemistry manufacturing and product development teams. Through his role, Law had access to all aspects of Rocket's chemistry manufacturing, analytics, supply chain and clinical trial information for both the AAV and LVV programs.

Gutierrez joined Rocket as a "Scientist" and was eventually promoted to "Senior Scientist." She developed AAV analytics, assisted in the drafting of Investigational New Drug applications to the U.S. Food and Drug Administration ("FDA"), and supported the expansion of the capabilities of the R&D lab to do reliable analytics in-house.

While he was still employed with Rocket, Law interviewed with Lexeo and received a letter from Lexeo formally offering him employment. Before leaving Rocket, Law transferred 122,987 Rocket emails and documents from his Rocket work computer to his personal computer. Many of the documents were marked "CONFIDENTIAL." The emails contained, for example, clinical trial study designs, patient data, and information about Rocket's drug manufacturing process. He also downloaded additional files from his Rocket computer onto two USB drives and

3

used an application called TimeMachine to back up his entire Rocket work computer to an external hard drive. He downloaded the applications "AppCleaner" and "Nektony App Cleaner" to his Rocket computer to delete traces of the applications he used to remove these documents. He also took photographs of Rocket's laboratories using his work phone that captured lab protocols on another employee's notebook, cell culture techniques and cell data related to the development of AAV and LVV gene therapies. In his exit interview with Rocket, he did not inform the company that he was leaving to work for Lexeo.

Gutierrez also accepted a position at Lexeo while she was still working at Rocket. Three weeks before she left Rocket, Gutierrez forwarded an e-mail to her personal e-mail account from her former supervisor that included a link that he stated contained every file he had ever generated at Rocket. The link contained a substantial amount of Rocket's confidential and proprietary manufacturing documents. In her exit interview, she did not tell Rocket that she was leaving to work at Lexeo.

In December 2021, Rocket learned that Law had begun working at Lexeo. Rocket wrote a letter to Lexeo stating Law was required to inform Rocket of his employment with Lexeo but did not do so. Additionally, Rocket informed Lexeo that Law filled a key role at Rocket and came to learn confidential, proprietary, and trade secret information about Rocket and its business. Rocket stated that it expected that Lexeo will not encourage Law to disclose or use the Company's Confidential Information and refrain from putting Law in a position where it would be inevitable that he would disclose the Company's Confidential Information. Rocket also informed Lexeo that Dr. Law's employment agreement with Rocket included a non-compete provision.

In response, Lexeo wrote to Rocket that it had no interest in or intent to use any proprietary information of Rocket. In fact, prior to the commencement of Law's employment with Lexeo, Law was informed in writing that Lexeo did not desire to acquire from him any trade secrets, know how or confidential business information that he might have received from a third party, such as Rocket. Lexeo confirmed that Law had been instructed by Lexeo, and had agreed, not to improperly use or disclose to Lexeo any confidential, proprietary or trade secret information of Rocket and that prior to commencing employment with Lexeo, Law was instructed that he was not permitted to bring any confidential, proprietary or trade secret information of Rocket on to Lexeo's premises. At a May 2023 conference for AAV research in the cardiac field, Rocket scientists observed a poster publicizing a Lexeo paper about the merits of the AAVrh.10 gene therapy vector opposed to AAV9 gene therapy vector in which Law and Gutierrez were two of thirteen authors.

On September 29, 2023, Lexeo filed a Form S-1 Registration Statement with the Securities and Exchange Commission to commence an initial public offering. In this filing, Lexeo stated that it received Investigative New Drug clearance from the FDA for its PKP-2 ACM treatment in July 2023.

**II.    Dr. Peluso's History With Renovacor, Inc. And Rocket's Acquisition of Renovacor**

Lexeo would like Dr. Peluso to serve as an expert on technical matters relevant to Lexeo's defenses against claims brought by Rocket. (Peluso Decl., ECF No. 114, ¶¶ 1, 7.) Those technical matters include "Lexeo's use or non-use from a technical perspective of information identified by Rocket, Lexeo's records of independent development, and the general availability in public sources of technical information identified by Rocket." (*Id.* ¶ 7.)

5

On October 28, 2021, Dr. Peluso had entered into a consulting agreement with Renovacor, Inc. ("Renovacor"), which included a provision requiring Dr. Peluso to hold in confidence Renovacor's confidential information during the term of the agreement and for a period of five years thereafter (the "Consulting Agreement"). (*Id*. ¶ 4; *see also* Consulting Agmt., Ex. 1 to Williamson Decl., ECF No. 106-1, at 2.) Pursuant to the Consulting Agreement, Dr. Peluso did consulting work for Renovacor. (Peluso Decl. ¶¶ 3-4.) The Agreement, which was filed under seal, had a term of one year and provided that Dr. Peluso was to provide expert opinion and consulting on CMC topics. (Consulting Agmt. at PDF p. 10; *see also* Pl.'s 11/25/24 Ltr. Mot. at 3 (Dr. Peluso's consulting included "CMC processes, manufacturing and process development, and regulatory filings and support").) The Consulting Agreement also provided that it would inure to the benefit of the parties and their respective successors. (Consulting Agmt. at PDF p. 7; *see also id.* (permitting Renovacor to transfer or assign Agreement without prior written consent of Dr. Peluso).)

During the course of his work, Dr. Peluso was a member of Renovacor's Scientific Advisory Board ("SAB"), and he attended four meetings of the SAB, including meetings discussing Rocket's acquisition of Renovacor,[6] and Dr. Peluso received information about Rocket and its AAV programs during the acquisition process. (Pl.'s 11/25/24 Ltr. Mot. at 1-3; Williamson Decl., ECF No. 106/107, ¶ 5; Renovacor's SAB Meeting Attendance, Ex. 4 to Williamson Decl., ECF No. 106-04; Peluso Decl. ¶ 4.) Dr. Peluso received, *inter alia*, slides during one of the SAB meetings. (Pl.'s 11/25/24 Ltr. Mot. at 3; *see also* Renovacor's 10/13/22 SAB Slides, Ex. 5 to Williamson Decl., ECF

---

[6] In September 2022, it was publicly announced that Rocket had agreed to acquire Renovacor. (Rocket 9/20/22 Press Release, ECF No. 106-2, at PDF p. 2.)

No. 106-5.) Such slides were marked confidential and distribution was limited to the SAB members and Renovacor employees. (*See*, *e.g.*, Renovacor's 10/13/22 SAB Slides at 1.)

To the best of his recollection, all the work that Dr. Peluso did for Renovacor concerned its program to treat patients with mutations in the BAG3 gene.[7] (Peluso Decl. ¶ 4.) Dr. Peluso did not work on an ACM program for Renovacor, and to the best of his recollection, he did not receive confidential information about any such program. (*Id*. ¶ 5.)

Dr. Peluso's work ended in late 2022, before Renovacor was acquired by Rocket, and Dr. Peluso states that he was later informed that his Consulting Agreement was assigned to Rocket when Rocket acquired Renovacor. (*See* Peluso Decl. ¶¶ 3-4, 6.) The acquisition of Renovacor by Rocket, which was completed on December 1, 2022, was accomplished by means of a merger agreement.[8] (*See* Rocket 12/1/22 Press Release.)

---

[7] The Rocket press release announcing that Rocket had completed its acquisition of Renovacor states that "[t]he acquisition provide[d] Rocket with Renovacor's most advanced program, REN-001, an AAV-based gene therapy targeting BAG3-associated dilated cardiomyopathy ([']DCM[']), a severe form of heart failure." (Rocket 12/1/22 Press Release, ECF No. 106-3, at PDF p. 2.) DCM "is a type of heart muscle disease that causes the heart chambers (ventricles) to thin and stretch, growing larger." *Dilated Cardiomyopathy*, Mayo Clinic (2024), available at https://perma.cc/2K2Y-KK8S.

[8] On September 20, 2022, Rocket had entered into an Agreement and Plan of Merger (the "Merger Agreement") with Renovacor; Zebrafish Merger Sub, Inc., a Delaware corporation that was a direct wholly owned subsidiary of Rocket ("Merger Sub I"); and Zebrafish Merger Sub, LLC, a Delaware limited liability company that also was a direct wholly owned subsidiary of Rocket ("Merger Sub II"). *See* Rocket Form 8-K, dated 12/1/22, at 1, available at www.sec.gov (EDGAR Central Index Key 1281895). On December 1, 2022, pursuant to the terms of the Merger Agreement, (i) Merger Sub I merged with and into Renovacor (the "First Merger") and (ii) Renovacor, as the surviving company of the First Merger, merged with and into Merger Sub II (the "Second Merger" and together with the First Merger, the "Mergers"), with Merger Sub II surviving the Mergers. *See id*. Under the terms of the Merger Agreement, shareholders of Renovacor became shareholders of Rocket, with Renovacor shareholders receiving, for each share of Renovacor common stock, 0.1763 shares of Rocket common stock. (*See* Rocket 12/1/22 Press Release.)

### III.     Dispute Regarding Dr. Peluso

On November 4, 2024, pursuant to Section 7.7 of the Protective Order in this case, entitled "Notice of Disclosure to Experts," Lexeo disclosed Dr. Peluso as an expert it intended to use.[9] (Pl.'s 11/25/24 Ltr. Mot. at 3.) Dr. Peluso's curriculum vitae did not disclose his prior consulting work for Renovacor. (Peluso Curriculum Vitae, Ex. 6 to Williamson Decl., ECF No. 106-6.) On November 10, 2024, Rocket timely objected in writing to Lexeo's retention of Dr. Peluso. (Pl.'s 11/25/24 Ltr. Mot. at 3.) On November 14, 2024, the parties met and conferred regarding Rocket's objection. (*Id*.) Following the meet and confer, on November 21, 2024, counsel for Rocket shared with counsel for Lexeo a copy of Dr. Peluso's Consulting Agreement and the October 13, 2022 slide presentation that Dr. Peluso received as part of Renovacor's SAB. (Pl.'s 11/25/24 Ltr. Mot. at 3; *see also* Consulting Agmt.; Renovacor's 10/13/22 SAB Slides; Email Correspondence, Ex. 7 to Williamson Decl., ECF No. 106-7, at PDF pp. 1-2.) Later in the day on November 21, 2024, counsel for Lexeo refused to withdraw their use of Dr. Peluso. (Pl.'s 11/25/24 Ltr. Mot. at 3; Email Correspondence at PDF p. 1.)

On November 25, 2024, Rocket filed the Letter Motion that is now before the Court. (*See* Pl.'s 11/25/24 Letter Mot.) In its Letter Motion, Rocket contends that Dr. Peluso should be disqualified because of his consulting related to Renovacor's AAV gene therapy platforms. (*Id*. at 1-3.) In particular, Rocket argues that the subject matter of Dr. Peluso's consulting for Renovacor

---

[9] Section 7.7 of the Protective Order provides that, before any Protected Material (as defined therein) is provided to any expert, counsel for the receiving party must provide to the designating party written notice, including the expert's name, the expert's curriculum vitae, the expert's current employer and title, all cases in which the expert has testified in a deposition or trial in the past four years and a copy of the "Acknowledgment and Agreement to Be Bound" signed by the Expert. (Prot. Order, ECF No. 77, § 7.7.) Within seven days of receipt of the disclosure of the expert, the designating party may object in writing to disclosure of Protected Material to the expert for good cause. (*Id*.)

8

involved the same technology area—AAV gene therapy for cardiac conditions—that Rocket has alleged was misappropriated; Dr. Peluso had access to Rocket's confidential information regarding the AAV gene therapy technology at issue in this case; and he owes a continuing confidentiality obligation to Rocket based on his work for Renovacor. (*See id*.) Rocket also contends that, through his service on the Renovacor SAB, Dr. Peluso was involved with Rocket's acquisition of Renovacor and received information about Rocket and its AAV programs during the acquisition process. (*Id*. at 2.) Rocket included with its Letter Motion the October 13, 2022 slide presentation that Dr. Peluso received as part of Renovacor's SAB (and that Rocket shared with Lexeo during the meet-and-confer process), which explicitly mentions Rocket's information on slides 9, 36 and 51. (Renovacor's 10/13/22 SAB Slides at PDF pp. 10, 37 and 52.)

On December 2, 2024, Lexeo filed its Letter Response in opposition to Dr. Peluso's disqualification. (Def. Lexeo's 12/2/24 Ltr. Resp., ECF Nos. 111/112.) Lexeo contends that Dr. Peluso never entered into a confidential relationship with Rocket, never worked for Rocket in any capacity and never received any of Rocket's confidential information. (*Id*. at 2.) In its Letter Response, Lexeo demonstrates that the information about Rocket in the October 13, 2022 slide presentation was publicly available, and thus cannot constitute Rocket's confidential information. (*Id*. at 4-7.)

On December 9, 2024, Rocket filed its reply. (Pl.'s 12/9/24 Reply, ECF No. 119.) On December 13, 2024, the Court held a telephone conference to address the pending Letter Motion. (12/13/24 Tr., ECF No. 124.)

**LEGAL STANDARDS**

"The Court has the inherent power to disqualify an expert witness when such relief is warranted." *Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y.), *aff'd*, 293 F. Supp. 2d 315 (S.D.N.Y. 2003) (citation omitted); *accord Capitol Records, Inc. v. MP3tunes, LLC*, No. 07-CV-09931 (WHP), 2010 WL 11590131, at *1 (S.D.N.Y. Apr. 15, 2010) (citing *Rodriguez*, 293 F. Supp. 2d at 311)) (same).

"In determining whether disqualification is appropriate based on a prior relationship between an expert and the party moving for disqualification, the court should consider whether (1) the movant had a prior confidential relationship with the expert; and (2) the movant had disclosed to the expert confidential or privileged information." *Eastman Kodak Co. v. Kyocera Corp.*, No. 10-CV-06334 (CJS), 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012) (citing cases); *see also Rodriguez*, 293 F. Supp. 2d at 311 (citations omitted). "To the extent the nature of the disclosures is disputed, courts also consider whether the confidential information revealed is relevant to the current litigation." *Auto-Kaps, LLC v. Clorox Co.*, No. 15-CV-01737 (BMC), 2016 WL 1122037, at *2 (E.D.N.Y. Mar. 22, 2016) (citations omitted). "Lastly, courts in this Circuit have considered . . . the public's interest in preserving judicial integrity and fairness as balanced against the party's right to the assistance of experts who possess specialized knowledge and the right of such experts to pursue their professional calling." *Id*. (citations omitted).

"Disqualification is designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." *Eastman Kodak Co.*,

2012 WL 4103811, at *8 (citation omitted). "Disqualification is a drastic remedy, however, and should be resorted to rarely." *Id.* at *8 (citation omitted).

## **ANALYSIS**

Having carefully reviewed the submissions of the parties, and the arguments of counsel, based upon the relevant factors, the Court finds that Rocket has met its burden to show that the drastic remedy of disqualification is warranted.

First, Rocket had a prior confidential relationship with Dr. Peluso. Dr. Peluso entered into the Consulting Agreement with Renovacor in October 2021, which contained confidentiality provisions. (*See* Consulting Agmt. at PDF pp. 3-4.) Although the term of the Agreement expired one year later, the confidentiality provisions extended for another five years thereafter. (*See id.* at 3.) Moreover, the Consulting Agreement, by its terms, inured to the benefit of Renovacor's successors. (*See id.* at PDF p. 7.) As Lexeo admits (*see* 12/13/24 Tr. at 7), Rocket is a successor to Renovacor as a result of the merger. *See U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 156 (2d Cir. 2019) ("a successor by merger is deemed by operation of law to be both the surviving corporation and the absorbed corporation").[10] Thus, as a matter of law, Rocket had a prior confidential relationship with Dr. Peluso.

Second, Rocket has shown that its confidential information was in fact disclosed to Dr. Peluso. Lexeo contends that, as a result of his consulting work for Renovacor, Dr. Peluso never received any of Rocket's confidential information. (*See* Def. Lexeo's 12/2/24 Ltr. Resp. at 2.) However, as a result of the merger, Renovacor and Rocket essentially are one and the same. *See*

---

[10] In addition, as noted earlier, Dr. Peluso at some point was informed that the Consulting Agreement was assigned to Rocket. (*See* Peluso Decl. ¶ 6.)

11

*U.S. Bank Nat'l Ass'n*, 916 F.3d at 156. Rocket has demonstrated that Dr. Peluso received confidential information from Renovacor during his service on the SAB, including certain pages from the October 13, 2022 slide presentation.[11] (*See* Renovacor's 10/13/22 SAB Slides; *see also* Pl.'s 12/9/24 Reply at 1.) Moreover, as an SAB member, Dr. Peluso was privy to information regarding both Renovacor's and Rocket's AAV technology while the merger was under consideration. (*See* Pl.'s 12/9/24 Reply at 1-2.)

Third, Rocket has provided "specific and unambiguous evidence" that the confidential information revealed to Dr. Peluso by Renovacor is relevant to this case. *See Auto-Kaps*, 2016 WL 1122037, at *3 (quoting *Eastman Kodak Co.*, 2012 WL 4103811, at *8). "[T]he disqualification test does not focus on the specific point of expertise that will be extracted from the former employee or consultant[;] [r]ather, it asks the Court to determine the relevance of the confidential material to the 'current litigation' as a whole." *In Re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-CV-08924 (CM) (GWG), 2022 WL 203191, at *7 (S.D.N.Y. Jan. 24, 2022), *aff'd*, 2022 WL 656808 (S.D.N.Y. Mar. 4, 2022) (citing *Auto-Kaps*, 2016 WL 1122037, at *2-3). As noted by Lexeo (*see* 12/19/24 Tr. at 11), this case concerns Rocket's trade secrets regarding its AAV-based gene therapy program (*see Rocket Pharms., Inc.*, 2024 WL 3835264, at *1, *4; *see also* Compl., ECF No. 1, ¶ 55), and what was disclosed to Dr. Peluso was confidential information regarding

---

[11] Although Lexeo persuasively has demonstrated that information regarding Rocket that is contained in slides 9, 36 and 51 from the October 2022 Renovacor SAB meeting is publicly available (*see* Def. Lexeo's 12/2/24 Ltr. Resp. at 4-7), other portions of the slide presentation were confidential (*see* Renovacor's 10/13/22 SAB Slides at PDF pp. 13-21, 32 (labeled "Confidential: Distribution is limited to Renovacor Scientific Advisory Board Members and Renovacor employees")), and no showing has been made any of those portions were made public. (12/13/24 Tr. at 19 (Rocket counsel: "[W]e have not been able to find information of this breadth and granularity in the public domain[,] [a]nd I don't think Lexeo has been able to either.").) In addition, the slides of course do not reflect discussions that would have been had by SAB meeting attendees about Rocket and the acquisition.

Renovacor's program, which also was an AAV-based gene therapy program.[12] (*See* n.7, *supra*; *see also* Pl.'s 12/9/24 Reply at 2-3.)

For example, as noted by Judge Castel in his Opinion and Order deciding Defendants' motion to dismiss, "[t]he Complaint . . . sets forth categories of trade secrets [alleged to have been misappropriated] related to Rocket's investigational AAV gene therapy target information, including '. . . clinical trial design, . . . patient data, patient protocols, [and] patient identification data . . . .'" *See Rocket Pharms*, 2024 WL 3835264, at *4 (quoting Compl. ¶ 67). Rocket has shown that Dr. Peluso was provided confidential information by Renovacor regarding some of these same categories of information. (*See*, *e.g.*, Renovacor's 10/13/22 SAB Slides at PDF pp. 13-18 (study design), 19 (patient-related data).) Accordingly, Rocket has established that Dr. Peluso was provided confidential information that is relevant to the case as a whole.

Dr. Peluso states in his Declaration that he is "confident that [he] could serve as an expert on technical matters in this case . . . without disclosing or using any of Renovacor's confidential information." (Peluso Decl. ¶ 7.) The Court, however, is satisfied that Rocket has made a showing that Dr. Peluso, despite his best efforts, could use against Rocket (which, as a result of the merger, essentially is the same entity as Renovacor) confidential information that Dr. Peluso learned from

---

[12] Contrary to Lexeo's assertion that Rocket has failed to identify specific disclosures of information to Dr. Peluso (Def. Lexeo's 12/2/24 Ltr. Resp. at 8), Rocket has made such an idenfication. What was disclosed to Dr. Peluso was confidential information regarding an AAV-based gene therapy for cardiomyopathy. (*See* Pl.'s 12/9/24 Reply at 3.)

Renovacor in the course of his earlier engagement.[13] "Although [Dr. Peluso] may not think at this time that any knowledge he gained at [Renovacor] will be relevant, 'the danger is that no one may know how the information he learned from [Renovacor] may affect his opinion and [Dr. Peluso] may inadvertently use confidential information.'" *Auto-Kaps*, 2016 WL 1122037, at *4 (quoting *Alien Tech. Corp. v. Intermec, Inc.*, No. 06-CV-00051 (RSW), 2007 WL 4261972, at *2 (D.N.D. Nov. 30, 2007)); *see also id*. ("An expert cannot build a Chinese wall in his own mind, despite his best efforts to do so."). The Court thus finds that Dr. Peluso possesses relevant information that may inform his expert opinions.

Finally, the Court is to balance "the public's interest in preserving judicial integrity and fairness" against "the party's right to the assistance of experts who possess specialized knowledge and the right of such experts to pursue their professional calling." *Auto-Kaps*, 2016 WL 1122037, at *2. "While a party moving to disqualify an expert has the burden of showing that the expert had a confidential relationship with the movant and that confidential information relevant to the litigation was transmitted to the expert, it is the non-movant's burden to show that other factors outweigh the public's interest in judicial integrity and fairness." *N.Y.C. Policing*, 2022 WL 203191, at *8 (citing *Auto-Kaps*, 2016 WL 1122037, at *4).[14]

---

[13] Lexeo's argument that Rocket has "a fatal chronology problem" (Def. Lexeo's 12/2/24 Ltr. Resp. at 10) is unavailing. Lexeo correctly observes that Law and Gutierrez are alleged to have misappropriated "trade secrets and confidential information when they left Rocket in September and October 2021" and thus that "Law and Gutierrez could not have taken any of the Renovacor confidential information that Rocket acquired because they left Rocket more than a year before that acquisition occurred." (*Id*. (emphasis omitted).) Nevertheless, in performing his expert work in this case, Dr. Peluso would be in a position to use, even unwittingly, confidential information he learned from Renovacor, since such information relates to AAV-based gene therapy.

[14] Other courts have ruled that the burden lies with the movant to show that to show that balancing weighs in favor of disqualification. *See Auto-Kaps*, 2016 WL 1122037, at *2; *see also Grioli v. Delta Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 13 (E.D.N.Y. 2005). However, as Judge Gorenstein ruled in *N.Y.C. Policing*,

Lexeo avers that it would be prejudiced if Dr. Peluso would be disqualified due to his "specialized knowledge to assist with the technical issues in this case and the burden to Lexeo of finding another similarly skilled expert." (Def. Lexeo's 12/2/24 Ltr. Resp. at 11.) This is, according to Lexeo, because Dr. Peluso possesses specialized knowledge that is rare in both academia and industry, and "experts with similar training and experience generally are not available to serve as experts because they are employed by operating companies that do not allow such engagements." (*Id.*) However, Lexeo has not specifically alleged what qualities Dr. Peluso possesses that other potential experts (*e.g.*, Lexeo's other virology expert, Dr. Kelley-Clarke (*see* Pl.'s 12/9/24 Reply at 3)) lack. Thus, the Court is unable "to conclude that [Dr. Peluso] is the only possible expert that could be retained by [Lexeo] in this matter." *N.Y.C. Policing*, 2022 WL 203191, at *9.

Taken together, the relevant factors favor disqualification of Dr. Peluso. In the circumstances presented, it would reflect poorly on the integrity of the judicial process if Lexeo, a company accused of stealing trade secrets regarding an AAV-based gene therapy program from its rival, was permitted, with judicial imprimatur, to use an expert who previously had access to confidential information of its rival's merger-partner regarding AAV-based gene therapy. "[W]hatever burden may fall on [Lexeo] by retaining a less desirable expert is simply not sufficient to outweigh the public interest in the integrity of these proceedings." *N.Y.C. Policing*, 2022 WL 203191, at *9.

---

2022 WL 203191, at *8 n.5, "[t]he allocation of the burden is of no moment in this case, however, inasmuch as [the undersigned] would reach the same conclusion regardless of which party bore the burden on the public interest balancing factor." *Id.*

**CONCLUSION**

For the foregoing reasons, Plaintiff's Letter Motion is GRANTED and Dr. Peluso is disqualified from acting as an expert for Lexeo in this matter.

**SO ORDERED.**

Dated:   New York, New York
         December 17, 2024

_____
STEWART D. AARON
United States Magistrate Judge